# BARDON v. NORTHERN PACIFIC RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WISCONSIN.

No. 343.   Argued April 27, 28, 1892. — Decided May 16, 1892.

Land which, at the time of the grant of July 2, 1864, 13 Stat. 365, c. 217, of public lands to the Northern Pacific Railroad Company, was segregated from the public lands within the limits of the grant by reason of a prior preëmption claim to it, did not, by the cancellation of the preëmption right before the location of the grant pass to the company, but remained part of the public lands of the United States, subject to be acquired by a subsequent preëmption settlement ·followed up to acquisition of title.

IN EQUITY.   The case is stated in the opinion.

*Mr. John B. Sanborn* and *Mr. William F. Vilas* for appellant.

*Mr. James McNaught* (with whom were *Mr. F. M. Dudley, Mr. A. H. Garland* and *Mr. H. J. May* on the brief) for appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

The plaintiff, the Northern Pacific Railroad Company, a corporation organized under the act of Congress of July 2, 1864, 13 Stat. 365, c. 217, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound on the Pacific coast by the northern route," and having its principal places of business in the city of New York, in the State of New York, and in

the city of St. Paul, in the State of Minnesota, brings this suit against Mary Bardon, a citizen of Wisconsin, to charge her as trustee of certain real property held by her in that State, and compel her to convey the same to the company.

The bill, as amended, sets forth the most important provisions of the act of Congress organizing the company and authorizing it to "locate, construct, furnish, maintain and enjoy, a continuous railroad and telegraph line with the appurtenances, namely, beginning at a point on Lake Superior, in the State of Minnesota or Wisconsin, thence, westerly, by the most eligible railroad route, as should be determined by your orator, within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget's Sound, with a branch via the valley of the Columbia River to a point at or near Portland, in the State of Oregon," and vesting it with the powers, privileges and immunities necessary to carry into effect the purposes of the act.

By the third section of the act a grant of land is made to the company. The section, so far as it bears upon the questions involved, is as follows :

"SEC. 3. *And be it further enacted*, That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line as said company may adopt through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever on the line thereof the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said

time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections : *Provided,* That if said route shall be found upon the line of any other railroad route to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general· line, the amount of land heretofore granted shall be deducted from the amount granted by this act : *Provided further,* That the railroad company receiving the previous grant of land may assign their interest to said Northern Pacific Railroad Company, or may consolidate, confederate and asso-ciate with said company upon the terms named in· the first section of this act."

The Northern Pacific Railroad Company, under this act of incorporation, proceeded to designate the general route of its proposed road, and afterwards to have its line definitely fixed. The necessities of the case do not require us to go into a very close consideration of these matters. The admissions of coun-sel reduce the questions for decision within narrow limits. It is conceded that the premises in controversy lie within the place limits of the grant to the Northern Pacific Railroad Company, and that the title to them would pass to that com-pany under the grant and the compliance of the company with its conditions, unless they are excepted from the grant by the facts admitted in the pleadings and·the stipulation of parties.

Among the facts admitted are these : That on and prior to September 12, 1855, the tract of land, in relation to which this suit was brought, had been surveyed by the United States and was a part of the public domain, subject to sale by preëmption and otherwise as then provided by law; that on that day James S. Robinson, Jr., settled upon the land, and that he was at the time a qualified preëmptor; that on the 21st of Sep-tember following ·he filed his declaration of settlement upon the land, under the preëmption laws, with the register and re-

ceiver at the proper land office of the United States; that he died without making final proof on the preëmption claim or paying the government for the land; that after his death his heirs, on the 30th of July, 1857, made payment for the land and received the receiver's receipt therefor and a certificate of purchase from the register, with the statement that, on its presentation to the Commissioner of the General Land Office, the heirs would be entitled to receive a patent for the land; that on the 5th of August, 1865, this preëmption entry was cancelled by the Commissioner of the General Land Office for alleged failure to furnish proof of continuous residence prior to July 30, 1857; that Robinson did not, in his lifetime, pay to the government the money required under the preëmption laws of the United States to acquire title to the land, except such fees as are paid to local officers at the time of filing a preëmption application; and that whatever money was paid for and on account of the land, prior to 1865, was paid by the heirs of Robinson, except the fees mentioned, and whatever money was thus paid was refunded to the heirs by the government upon the cancellation of the preëmption claim.

It is thus seen that when the grant to the Northern Pacific Railroad Company was made, on the 2d of July, 1864, the premises in controversy had been taken up on the preëmption claim of Robinson, and that the preëmption entry made was uncancelled; that by such preëmption entry the land was not at the time a part of the public lands; and that no interest therein passed to that company. The grant is of alternate sections of public land, and by public land, as it has been long settled, is meant such land as is open to sale or other disposition under general laws. All land, to which any claims or rights of others have attached, does not fall within the designation of public land. The statute also says that whenever, prior to the definite location of the route of the road, and of course prior to the grant made, any of the lands which would otherwise fall within it have been granted, sold, reserved, occupied by homestead settlers, or preëmpted or otherwise disposed of, other lands are to be selected in lieu thereof under the direction of the Secretary of the Interior. There would therefore be no

question that the preëmption entry by the heirs of Robinson, the payment of the sums due to the government having been made, as the law allowed, by them after his death, took the land from the operation of the subsequent grant to the Northern Pacific Railroad Company, if the preëmption entry had not been subsequently cancelled. But such cancellation had not been made when the act of Congress granting land to the Northern Pacific Railroad Company was passed; it was made more than a year afterwards. As the land preëmpted then stood on the records of the Land Department, it was severed from the mass of the public lands, and the subsequent cancellation of the preëmption entry did not restore it to the public domain so as to bring it under the operation of previous legislation, which applied at the time to land then public. The cancellation only brought it within the category of public land in reference to future legislation. This, as we think, has long been the settled doctrine of this court.

In *Wilcox* v. *Jackson*, 13 Pet. 498, 513, this court held that whenever a tract of land has been legally appropriated to any purpose, from that moment it becomes severed from the mass of public lands, and no subsequent law, or proclamation, or sale will be construed to embrace it, or to operate upon it, although no reservation of it be made. The validity and effect of the appropriation do not depend upon its not being subjected afterwards to cancellation because of the omission of some particular duty of the party claiming its benefit.

In *Witherspoon* v. *Duncan*, 4 Wall. 210, 218, this court held that if a party entitled by law to enter land at the land office does so, when the certificate of entry is given to him, a contract is executed between him and the government, and thereafter the land ceases to be a part of the public domain. The court considered the question whether there was any difference in such case between a cash and a donation entry, the one being complete when the money was paid, and the other not until it was confirmed by the General Land Office and a patent issued. There, it is true, the question was as to the power of a State to tax the land before the patent issued, and the court said if the law on the subject is complied with and

the entry conforms to it, it is difficult to see why the right to tax does not attach as well to the donation as to the cash entry. In either case, when the entry is made and a certificate is given, the particular land is segregated from the mass of public lands and becomes private property.

In *Hastings &c. Railroad Co.* v. *Whitney*, 132 U. S. 357, 361, this court, in commenting upon the decision in the case last cited, said : " The fact that such an entry may not be confirmed by the land office on account of any alleged defect therein, or may be cancelled or declared forfeited on account of non-compliance with the law, or even declared void, after a patent has issued, on account of fraud, in a direct proceeding for that purpose in the courts, is an incident inherent in all entries of public lands." And it added : " In the light of these decisions, the almost uniform practice of the department has been to regard land, upon which an entry of record valid upon its face has been made, as appropriated and withdrawn from subsequent homestead entry, preëmption, settlement, sale or grant until the original entry be cancelled or declared forfeited ; in which case the land reverts to the government as part of the public domain, and becomes again subject to entry under the land laws."

The case of *Leavenworth, Lawrence & Galveston Railroad* v. *United States*, 92 U. S. 733, well illustrates this doctrine. It was here at October term, 1875, and was elaborately argued. It was a suit in equity brought by the United States to establish their title to certain tracts of land, and to enjoin the railroad company from setting up any right or claim to them. A grant had been made by the act of Congress of March 3, 1863, to the State of Kansas of certain tracts of land lying in what is known as the " Osage country," to aid in the construction of certain railroads and telegraph lines in that State. Within the limits of the Osage country there had been reserved by treaty with the Great and Little Osage tribes of Indians certain described tracts of land in that State so long as they might choose to occupy the same. (7 Stat. 240.) The act contained words of conveyance similar to those used in other grants by Congress to aid in the construction of rail-

roads, without a specific exception of any lands as being subject to the use of the Indians. The only exceptions to the granting clause were: 1st, that in case it should appear that the United States had, when the lines or routes of the road and branches were definitely fixed, sold any section or any part thereof granted, or that the right of preëmption or homestead settlement had attached thereto, or the same had been reserved by the United States for any purpose whatever, then it should be the duty of the Secretary of the Interior to cause to be selected for the purposes aforesaid, from the public lands of the United States nearest to tiers of sections above specified, so much land, in alternate sections or parts of sections, designated by odd numbers, as should be equal to such lands as the United States had sold, reserved or otherwise appropriated, or to which the right of preëmption or homestead settlements had attached as aforesaid; and, 2d, that lands previously reserved to the United States by an act of Congress, or in any other manner by competent authority, for the purpose of aiding in any internal improvement, or for any other purpose whatsoever, were reserved from the operation of the act, except so far as it might be found necessary to locate the routes of the road and branches through such reserved lands, in which case the right of way only should be granted, subject to the approval of the President of the United States. After the granting act was passed the Indian title or right of occupancy was extinguished.

On the argument of the case the United States maintained that the granting act, though not mentioning the claim of the Indians, did not affect their lands, and was not intended to do so. The railroad company, on the contrary, contended that although the grant did not operate upon any specified lands until the road was located, it covered the lands in controversy, and by the extinction of the Indian title they had, in the proper sense of the term, become public lands. But the court answered that the grant was made for the purpose of aiding a work of internal improvement, and did not extend beyond that intent; that the grant was one *in præsenti;* and that the words " there be and is hereby granted " were those of absolute

donation. "They vest," said the court, "a present title in the
State of Kansas, though a survey of the lands and a location
of the road are necessary to give precision to it and attach it
to any particular tract."

The lands granted were designated by odd-numbered sec-
tions within certain definite limits, and only the public lands,
said the court, owned absolutely by the United States were
subject to survey and division into sections, and to them only
was the grant applicable. It embraced, therefore, only such
as could at the time be sold and enjoyed, and not those which
the Indians, pursuant to treaty stipulations, were left free to
enjoy. In affirmance of its views the court added that since
the land system was inaugurated the grants of the government,
either to individuals or to aid in works of internal improve-
ment, had always been recognized as attaching only to so
much of the public domain as was subject to sale or other
disposal, although the roads of many subsidized companies
passed through Indian reservations, observing that such grants
could not be otherwise construed, for Congress could not be
supposed to have thereby intended to include land previously
appropriated to another purpose, unless there was an express
declaration to that effect. A special exception of it was not
necessary, because the policy which dictated them confined
them to land which Congress could rightfully bestow without
disturbing existing relations and producing vexatious conflicts.

In *Buttz* v. *The Northern Pacific Railroad*, 119 U. S. 55,
a portion of the land granted was in the occupation of cer-
tain Indian tribes, and the act provided that the United
States should extinguish, as rapidly as might be consistent
with public policy and the welfare of the Indians, their title
to all lands falling under the operation of the act and ac-
quired in the donation to the road — a provision which dis-
tinguished the grant from the one in *The Leavenworth Case*.
In *The Buttz Case*, the grant passed the land, therefore, to the
railroad company subject to the Indians' right of occupancy,
which could only be interfered with or determined by the
United States.

In *The Leavenworth Case*, the appellant, the railroad com-

pany, contended that the fee of the land was in the United States, and only a right of occupancy remained with the Indians; that under the grant the State would hold the title subject to their right of occupancy; but as that had been subsequently extinguished, there was no sound objection to the granting act taking full effect. The court, however, adhered to its conclusion, that the land covered by the grant could only embrace lands which were at the time public lands, free from any lawful claim of other parties, unless there was an express provision showing that the grant was to have a more extended operation, citing the decision in *Wilcox* v. *Jackson*, 13 Pet. 498, to which we have referred above, that land once legally appropriated to any purpose was thereby severed from the public domain and a subsequent sale would not be construed to embrace it, though not specially reserved. And of the Indians' right of occupancy it said, that this right, with the correlative obligation of the government to enforce it, negatived the idea that Congress, even in the absence of any positive stipulation to protect the Osages, intended to grant their land to a railroad company, either absolutely or *cum onere.* "For all practical purposes," the court added, "they owned it; as the actual right of possession, the only thing they deemed of value, was secured to them by treaty, until they should elect to surrender it to the United States."

Three justices, of whom the writer of this opinion was one, dissented from the majority of the court in *The Leavenworth Case;* but the decision has been uniformly adhered to since its announcement, and this writer, after a much larger experience in the consideration of public land grants since that time, now readily concedes that the rule of construction adopted, that, in the absence of any express provision indicating otherwise, a grant of public lands only applies to lands which are at the time free from existing claims, is better and safer, both to the government and to private parties, than the rule which would pass the property subject to the liens and claims of others. The latter construction would open a wide field of litigation between the grantees and third parties.

A principle somewhat analogous to the one expressed in *The Leavenworth Case* was announced in *Kansas Pacific Railway Co.* v. *Dunmeyer*, 113 U. S. 629. There a homestead claim had been filed in the land office by one Miller upon part of an odd-numbered section lying within the place limits of the grant of land to the Union Pacific Railroad Company. The claim was recognized by a certificate of entry before the route of the company's road was definitely located. Subsequently to the definite location, Miller abandoned his entry and purchased the land from the railroad company, and to him a certificate of sale was given. This certificate of sale afterwards passed to one Lewis Dunmeyer, to whom the company gave a deed purporting to convey a good title. After Miller's purchase the homestead entry was cancelled. One G. B. Dunmeyer then made an entry of the land under the homestead law, claiming that by Miller's abandonment of the former entry and its cancellation the land had not been brought within the grant, but had reverted to the mass of the public land. Lewis Dunmeyer then brought an action against the company in the state court of Kansas, on the covenant in the deed for a good title, and recovered judgment, which was affirmed by the Supreme Court of the State, and from that court was brought here. The question, among others, considered was the effect of the abandonment of the homestead claim by Miller upon the ownership of the property. It was contended that although Miller's homestead claim had attached to the land within the meaning of the exception of the grant before the line of definite location was filed, yet, when he abandoned his claim so that it no longer existed, the exception ceased to operate, and the land reverted to the company; and that the grant, by its inherent force, reasserted itself and extended to and covered the land as though it had never been within the exception. But the court rejected this view, stating that it was unable to perceive the force of the proposition, observing: " No attempt has ever been made to include lands reserved to the United States, which reservation afterwards ceased to exist, within the grant, though this road, and others with grants in similar language, have more

than once passed through military reservations for forts and other purposes, which have been given up or abandoned as such reservations, and were of great value; nor is it understood that in any case where lands had been otherwise disposed of, their reversion to the government brought them within the grant." Not only does the land once reserved not fall under the grant should the reservation afterwards from any cause be removed, but it does not then become a source of indemnity for deficiencies in the place limits. Such deficiencies can only be supplied from lands within limits designated by the granting act or other law of Congress. The land covered by the preëmption entry being thereby excepted from the grant to the Northern Pacific Railroad Company was also thereby excepted from any withdrawals from sale or preëmption of public lands for its benefit.

From the decisions cited, and approving, as we do, the reasons on which they are founded, it follows that the land in controversy, upon which Robinson had made a preëmption claim as early as September 12, 1855, it being then open to preëmption sale, and subsequently filed his declaration of settlement under the preëmption laws, and by whose heirs, after his death, payment of the purchase price had been made, and to them a receiver's receipt therefor given, and a certificate of entry issued to them, was severed from the mass of public lands from which the grant to the Northern Pacific Railroad Company could alone be satisfied. That preëmption entry remained of record until August 5, 1865, when it was cancelled, but this was after the date of the grant to the Northern Pacific Railroad Company, and also after the dates of the several grants made to the State of Wisconsin to aid in the construction of railroad and telegraph lines within that State. The cancellation, as already said, did not have the effect of bringing the land under the operation of the grant to the Northern Pacific Railroad Company; it simply restored the land to the mass of public lands to be dealt with subsequently in the same manner as any other public lands of the United States not covered by or excepted from the grant.

No disposition was subsequently made of the land thus re-

stored to the public domain until December 2, 1871, when it seems that one Owen Sheridan applied for a homestead entry upon it, and was permitted to make such entry, and the same remained of record until the 30th of June, 1880, when it was cancelled. From that time the land continued a part of the unappropriated public lands of the United States until the 2d of January, 1881, when the appellant, Mary Bardon, made her preëmption settlement upon it and afterwards followed up the settlement with all the steps required by law for the acquisition of the title. On the 14th of February, 1881, she filed her declaratory statement therefor; on the 8th of June, 1882, she made her final proofs; on the 22d of June she made her payment for the land, and on the 19th of January, 1887, the Secretary of the Interior issued to her a patent of the United States for the land in the form provided by law.

There was nothing in any of the proceedings of the Northern Pacific Railroad Company, or of the companies to whom the land granted to Wisconsin was conveyed by the State, or in the acts of the appellant, which in any respect impaired her right to the completion of her preëmption claim, or to the full fruition of her perfected title.

It follows that

*The decree must be reversed, and the cause be remanded to the Circuit Court, with a direction to dismiss the bill; and it is so ordered.*