NORTHERN PAC. R. CO. et al. v. MUSSER SAUNTRY LAND, LOGGING & MANUF'G CO. et al.

(Circuit Court of Appeals, Seventh Circuit. July 9, 1895.)

No. 208.

1. PUBLIC LANDS—GRANTS TO RAILROADS—RESERVATIONS.
   By act of July 2, 1864 (13 Stat. 365), congress granted to the N. P. Co., in aid of the construction of its railroad, "every alternate section of public land not mineral, designated by odd numbers * * * on each side of said railroad line * * * not reserved * * * or otherwise appropriated * * * at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office." On July 6, 1882, the N. P. Co. filed a plat of the definite location of its line, within the state of Wisconsin, in the office of the commissioner, and in September, 1882, had completed such line. By act of June 3, 1856 (11 Stat. 20), congress had granted to the state of Wisconsin, in aid of the construction of a railroad, certain public lands in that state on each side of the road as it should be located, providing that if any lands within such grant had been sold or appropriated, other lands, within 15 miles from the road, might be selected by the state, subject to the approval of the secretary of the interior. The state bestowed this grant upon the S. C. Co. By act of May 5, 1864, congress made a further grant to the state in aid of the construction of such road, and provided that the indemnity lands might be selected within 20 miles from the line as definitely located. The state also bestowed this grant on the S. C. Co., which adopted a definite line, and notice of such bestowal and adoption was given to the secretary of the

interior. On February 28, 1866, the commissioner of the general land office directed the officers of the local land office to withhold the lands within the limits of such grants to the S. C. Co. from sale or location, and such lands were withdrawn accordingly, including certain lands more than 15 and less than 20 miles from the line of the S. C. Co., and within the place limits of the grant to the N. P. Co., as afterwards definitely fixed by the location of its line. The rights of the S. C. Co. afterwards passed to the C. & O. Co. which in 1882 completed the line, and in 1883 selected, as indemnity lands, part of the lands so withdrawn, within the limits of the grant to the N. P. Co. In 1885, the C. & O. Co. conveyed such lands to the M. Co. In 1889, it having been ascertained that the grant to the C. & O. Co. was satisfied without such lands, that company canceled its selection thereof. The M. Co. then made a cash entry of such lands, which was accepted, without regard to a protest made by the N. P. Co. *Held,* that the reservation of said lands by the land department excepted them from the operation of the grant to the N. P. Co., and that company acquired no right to them, either before or after the definite location of its line.

2. SAME—POWER OF LAND DEPARTMENT.
    *Held,* further, that it was within the power, and was the duty, of the land department, even after the passage of the act of July 2, 1864, making the grant to the N. P. Co., to reserve for the benefit of the C. & O. Co. the lands necessary to satisfy the prior grant made to it.

Appeal from the Circuit Court of the United States for the Western District of Wisconsin.

This was a suit by the Northern Pacific Railroad Company and Thomas F. Oakes, Henry C. Payne, and Henry C. Rouse, its receivers, against the Musser Sauntry Land, Logging & Manufacturing Company and the Chicago, St. Paul, Minneapolis & Omaha Railway Company to quiet the complainants' title to certain lands. The circuit court sustained a demurrer to the bill. Complainants appeal. Affirmed.

The appellants, complainants below, claim title to the lands in controversy under the third section of an act of congress approved July 2, 1864, which, so far as it bears upon the questions involved, is as follows: "Sec. 3. And be it further enacted, that there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores, over the route of said line of railway, every·alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections: provided, that if said route shall be found upon the line of any other railroad route to aid in the construction of which lands have been heretofore granted by 'the United States, as far as the routes are upon the same general line, the amount of land heretofore granted, shall be deducted from the amount granted by this act: provided further, that the railroad company receiving the previous land grant may assign their interest to said Northern Pacific Railroad Company, or may consolidate, confederate, and associate with said company upon the terms

named in the first section of this act." 13 Stat. 367. The Northern Pacific Railroad Company, hereafter called the "Pacific Company," accepted this grant on December 29, 1864. On July 30, 1870, it fixed the general route of its road, extending through Wisconsin, within 20 miles of the lands in controversy. Thereafter it proceeded with the survey and location of its line, and on July 6, 1882, definitely fixed that portion of its line extending opposite these lands by filing a plat thereof in the office of the commissioner of the general land office. The lands in controversy are within the limits of the grant, as defined by the plat of definite location filed July 6, 1882. By September, 1882, the Pacific Company had completed the line of its road coterminous with these lands; and such line, having been examined by commissioners appointed for that purpose by the president, was reported by them to have been completed in a good, substantial, and workmanlike manner, as required by the act of congress; and thereafter, on September 16, 1882, the president approved said report, and ordered that patents for the lands earned by the construction of the road should be issued to the company. These facts show that the legal title to these lands is vested in the Pacific Company, if not within the exceptions enumerated in the granting act. Whether these lands are within any of these exceptions depends upon the following facts: By an act entitled "An act granting lands to the state of Wisconsin to aid in the construction of railroads in said state," approved June 3, 1856 (11 Stat. 20), congress granted to that state, for the purpose of aiding in the construction of a railroad from Madison or Columbus, by way of Portage City, to St. Croix river or lake, between townships 25 and 31, and thence to the west end of Lake Superior and to Bayfield, every alternate section of land designated by odd numbers, for six sections in width, on each side of said road. The act further provided that in case it should appear that the United States had, when the line of said road was definitely located, sold any sections or parts thereof granted as aforesaid, or that the right of pre-emption had attached to the same, then it should be lawful for any agent or agents to be appointed by the governor of the state to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest to the tier of sections or parts of sections above specified, so much lands, in alternate sections or parts of sections, as should be equal to such lands as the United States had sold or otherwise appropriated, or to which the right of pre-emption had attached: provided that the lands so located should in no case be further than 15 miles from the road, and selected for and on account of such road. The state accepted this grant, and bestowed that portion of it which pertained to the line from the St. Croix river or lake to the west end of Lake Superior and to Bayfield upon the St. Croix & Lake Superior Railroad Company. On September 20, 1858, this company definitely located the line of its road between these points. The lands in controversy did not fall within either the place or indemnity limits as established under this grant. By an act approved May 5, 1864 (13 Stat. 66), entitled "An act granting lands to aid in the construction of certain railroads in the state of Wisconsin," it is provided: "Section 1. That there be and is hereby granted to the state of Wisconsin, for the purpose of aiding in the construction of a railroad from a point on the St. Croix river or lake, between townships twenty-five and thirty-one, to the west end of Lake Superior, and from some point on the line of said railroad, to be selected by said state, to Bayfield, every alternate section of public land, designated by odd numbers, for ten sections in width on each side of said road, deducting any and all lands that may have been granted to the state of Wisconsin for the same purpose, by the act of congress of June three, eighteen hundred and fifty-six, upon the same terms and conditions as are contained in the act granting lands to the state of Wisconsin, to aid in the construction of railroads in said state, approved June three, eighteen hundred and fifty-six. But in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold, reserved, or otherwise disposed of, any sections or parts thereof, granted as aforesaid, or that the right of pre-emption or homestead has attached to the same, then it shall be lawful for any agent or agents, to be appointed by said company, to select, subject to the approval of the secretary of the interior from the public lands of the United States nearest to the tier of sections above specified, as much land in alternate sections or parts

of sections, as shall be equal to such lands as the United States have sold o.' otherwise appropriated, or to which the right of pre-emption or homestead has attached as aforesaid, which lands (thus selected in lieu of those sold, and to *which pre-emption or homestead right has attached as aforesaid, together with* sections and parts of sections designated by odd numbers as aforesaid, and appropriated as aforesaid) shall be held by said state for the use and purpose aforesaid: provided, that the lands to be so located shall in no case be further than twenty miles from the line of the said roads, nor shall such selection or location be made in lieu of lands received under the said grant of June three, eighteen hundred and fifty-six, but such selection and location may be made for the benefit of said state, and for the purpose aforesaid, to supply any deficiency under the said grant of June third, eighteen hundred and fifty-six, should any such deficiency exist." The state accepted this act March 20, 1865, and on the same day conferred all the lands, rights, and privileges granted by the above section upon the St. Croix & Lake Superior Railroad Company. That company accepted the grant April 22, 1865, and, by a resolution of its executive committee, adopted the line as already located under the act of June 3, 1856, as the line of the road under the act of May 5, 1864. On May 5, 1865, copies of these resolutions, and of the act of the legislature of Wisconsin conferring this grant upon the St. Croix & Lake Superior Railroad Company, were filed with the secretary of the interior. On February 28, 1866, the commissioner of the general land office directed the register and receiver of the district land office to withhold the odd-numbered sections within 10 and 20 miles of said line, so fixed, from sale or location, pre-emption settlement, or homestead entry. This order was received and filed in the district land office on March 17, 1866.

The lands in controversy lie within the 20-mile limits of this withdrawal, but are more than 15 miles from the line as fixed. The St. Croix & Lake Superior Railroad Company having failed to construct said railroad, the grant to it was declared forfeited to the state. In February, 1882, the appellee the Chicago, St. Paul, Minneapolis & Omaha Railway Company, hereinafter called the "Omaha Company," succeeded, under the legislation of the state, to the rights of the St. Croix & Lake Superior Railroad Company; and during that year it completed the road past these lands and to the west end of Lake Superior. On May 12, 1883, and June 14, 1883, one W. H. Phipps, as agent for the Omaha Company, filed lists for selection of indemnity lands claimed as inuring to said company under said grant, including, among others, the lands in controversy. These selections were allowed by the officers of the district land office, but were never approved by the commissioner of the general land office nor by the secretary of the interior. The governor of the state caused patents for the lands in controversy, with other lands, to be issued to the Omaha Company. In 1885 and 1886 the Omaha Company executed deeds for these lands to the grantors of the Musser Sauntry Land, Logging & Manufacturing Company, which company acquired whatever interest in these lands was conveyed to the Omaha Company by the state. The secretary of the interior having completed the adjustment of the grants made by the acts of 1856 and 1864, it was ascertained in 1889 that these grants were satisfied without the lands in controversy; and on November 25, 1889, the Omaha Company relinquished these lands, with others, and requested that the attempted selection should be canceled, which cancellation was made in February, 1890. In November, 1889, the Musser Sauntry Company, having ascertained that these lands would not inure to the railroad company under the grant, applied to purchase the same, under the provisions of an act of congress approved March 3, 1887. The register and receiver of the district land office, disregarding the Pacific Company's protest, allowed the application, and accepted the cash tendered for the lands. In February, 1890, the secretary of the interior, in a ruling made in the course of the adjustment of the Omaha Company's grant, held that the indemnity lands, under the act of May 5, 1864, reserved by order of the commissioner of the general land office of February 28, 1866, were, by reason of such reservation, excepted from the operation of the grant to the Pacific Company in the act of July 2, 1864. On December 19, 1890, this ruling was reaffirmed, and is still in force. On March 5, 1891, in accordance with the rulings of the secretary of the interior, the Musser Sauntry Company made a new application to

purchase the lands in controversy, which was allowed; and on May 5, 1891, the Musser Sauntry Company was allowed to, and did, make a cash entry of these lands. The Pacific Company appealed from this allowance, but, on October 3, 1892, the commissioner of the general land office affirmed it, holding that these lands were excepted from the operation of the grant to the Pacific Company by the withdrawal order of 1866. To the complainants' bill setting out these facts, and praying that their title to these lands might be quieted, and that the defendants be enjoined from receiving or accepting patents therefor from the United States, and from cutting and removing the timber therefrom, the defendants interposed a demurrer, on the ground that the bill did not state a case entitling the complainants to any equitable relief. The demurrer was sustained, and, the complainants electing to stand upon their bill, a decree was entered dismissing the same for want of equity. From this decree the present appeal is prosecuted.

James McNaught and F. M. Dudley, for appellants.

Thomas Wilson, for appellees.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

After making the foregoing statement, the opinion of the court was delivered by BAKER, District Judge.

The lands in controversy are within the place limits of the Pacific Company's road. The title, therefore, passed to that company, if the lands were subject to the operation of the grant made by the third section of the act of July 2, 1864. The contention is that these lands were not subject to the operation of this grant, for the reason that they were withdrawn by the land department, in February, 1866, in order to satisfy the grant of indemnity lands made by the earlier acts of June 3, 1856, and May 5, 1864. These lands are within the indemnity, and not within the place, limits of the grant to the Omaha Company. The grant to the Pacific Company is of "every alternate section of public lands, * * * to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad, whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever prior to said time any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof." The rule that a grant by congress does not operate upon lands theretofore lawfully reserved, for any purpose whatever, has too often been declared to be no longer open to discussion. As was observed by the supreme court in the case of Railroad Co. v. Forsythe (decided June 3, 1895, and not yet officially reported) 15 Sup. Ct. 1020, "there can be no doubt as to this rule, or as to the fact that lands withdrawn from sale by the land department are considered as reserved within its terms." The lands in controversy within the indemnity limits of

the Omaha Company's road were not granted by the acts of 1856 or 1864. They were simply withdrawn from sale, pre-emption, or homestead entry by the action of the land department, in order that the beneficiary of the grant might, in case the full amount of lands granted was not found within the place limits, select therefrom enough to supply the deficiency. These lands, being within the indemnity limits of the Omaha Company, might be required to satisfy the earlier grant; but not being granted, they were still within the disposing power of congress. It has often been held that "until selection was made, the title remained in the government, subject to its disposal at its pleasure." Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 421, 5 Sup. Ct. 208; U. S. v. McLaughlin, 127 U. S. 428, 450, 455, 8 Sup. Ct. 1177; Wisconsin Cent. R. Co. v. Price Co., 133 U. S. 496, 511, 10 Sup. Ct. 341; U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 374, 12 Sup. Ct. 13. It follows that, notwithstanding the grant in the acts of 1856 and 1864 to the Omaha Company, the title to the indemnity lands which might be required to supply the deficiency in its place limits remained in the government, and was subject to its disposal at its pleasure. The congress might, without any violation of the rights of the Omaha Company, have granted to the Pacific Company all the lands within the indemnity limits of the former company, if it had chosen to do so. It is insisted that, as such grant might have been made, the act of July 2, 1864, ought to be so construed as to deny to the land department the power to withdraw any lands which, upon the definite location of the line of the Pacific Company, might be found to be within its place limits, although such withdrawal was made in order to satisfy the claims of an earlier grant to indemnity lands. The grant in the act of July 2, 1864, is a grant in praesenti. Its language is, "that there be, and is hereby granted." The construction and effect of such words of grant have often been considered by the supreme court. In the case of St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 5, 11 Sup. Ct. 389, Mr. Justice Field, speaking for the court, said:

"The language of the statute is, 'that there be, and hereby is granted' to the company every alternate section of the lands designated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but, when once identified, the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one in praesenti; that is to say, it is of that character as to all lands within the terms of the grant and not reserved from it at the time of the definite location of the route. This is the construction given to similar grants by this court, where the question has been often considered; indeed, it is so well settled as not to be open to discussion. Schulenberg v. Harriman, 21 Wall. 44, 60; Leavenworth, Lawrence, etc., R. Co. v. U. S., 92 U. S. 733; Missouri, Kansas, etc., Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 491; Railroad Co. v. Baldwin, 103 U. S. 426."

The foregoing statement of the law was quoted and approved in the recent case of U. S. v. Southern Pac. R. Co., 146 U. S. 570, 593, 13 Sup. Ct. 152. The lands in controversy were reserved, at the

time of the definite location of the line of the Pacific Company, by an order of the land department made after the passage of the act of July 2, 1864. These lands, having been reserved, were excepted out of the grant as much as if, in a deed, they had been excluded from the conveyance by metes and bounds, provided the reservation was one which the land department had the power to make. The true question for decision is, did the land department have lawful authority to reserve, after the passage of the act of July 2, 1864, lands which on the definite location of the road were found to be within the place limits of the Pacific Company, in order to satisfy the claims of an earlier grant to indemnity lands? The act of July 2, 1864, contains no limitation in this regard on the power of the land department. By excepting out of the grant all lands reserved for any public use, it impliedly recognizes the power of the land department to make such reservations. There is no language in the act which denies or limits the authority of the land department to make reservations for public purposes at any time before the definite location of the line shall have been fixed. What lands ought to be reserved in order to satisfy the various acts of congress, must, in the nature of things, be left largely to the discretion of this department. It is said that it would lead to monstrous injustice if the land department were clothed with such power. We see no force in this suggestion. No injustice will be done to the Pacific Company by holding that the land department has authority to reserve enough of the public domain to satisfy all earlier grants. In our judgment, that department is invested with such authority. A reference to some of the cases will, we think, make this apparent. The case of Wolcott v. Des Moines Co., 5 Wall. 681, is a leading case, and one of the earliest in which the effect of a reservation by the land department was considered. On August 8, 1846, congress granted to the then territory, now state, of Iowa, for the purpose of aiding it to improve the navigation of the Des Moines river from its mouth to the Raccoon Fork, one equal moiety, in alternate sections, of the public lands, in a strip five miles in width on each side of said river. In 1856, congress made a grant of lands to the state of Iowa, in alternate sections, to aid in the construction of certain railroads, by which act it was provided, "that any and all lands heretofore reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object whatsoever, be and the same are hereby reserved to the United States from the operation of this act." It was decided, in the case of Railroad Co. v. Litchfield, 23 How. 66, that the grant of August 8, 1846, did not extend above the mouth of the Raccoon Fork. Lands above the mouth of that fork had been reserved for the improvement of the navigation of the Des Moines river, first by the secretary of the treasury, and afterwards by the secretary of the interior. The lands the title to which was in controversy were situated above the mouth of the Raccoon Fork, and were within the place limits of the grant in aid of the railroads. It was contended that these lands had not been reserved by competent authority; that they were not within the limits of the

grant of August 8, 1846; and therefore that the railroad took the title to them under the latter grant. This contention was denied, the court observing:

"It has been argued that these lands had not been reserved by competent authority, and hence that the reservation was nugatory. As we have seen, they were reserved from sale for the specific purpose of aiding in the improvement of the Des Moines river, first by the secretary of the treasury, when the land department was under his supervision and control, and again by the secretary of the interior, after the establishment of this department, to which the duties were assigned, and afterwards continued by this department, under instructions from the president and cabinet. Besides, if this power was not competent, which we think it was ever since the establishment of the land department, and which has been exercised down to the present time, the grant of 8th August, 1846, carried along with it, by necessary implication, not only the power, but the duty, of the land office to reserve from sale the lands embraced in the grant. Otherwise, its object might be utterly defeated."

So the acts of 1856 and 1864, by necessary implication, carried not only the power, but the duty, of the land department, to reserve for the benefit of the Omaha Company the lands necessary to satisfy the grant made to it. In the case of Kansas Pac. Ry. Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, it was held that, where a homestead right had attached to a tract after the grant, and before the time of definite location of a railroad company's line, which homestead was afterwards abandoned, the tract was simply restored to the public domain, and did not pass to the railroad company under its grant; that the grant only attached to lands which were the subject of the grant at the time of definite location; and that the company had no interest in the question as to what afterwards became of a tract which was not public land at the time the grant became fixed. On page 644, 113 U. S., and page 566, 5 Sup. Ct., Mr. Justice Miller, in delivering the opinion of the court observed:

"The right of the homestead having attached to the land, it was excepted out of the grant as much as if, in a deed, it had been excluded from the conveyance by metes and bounds."

This doctrine was affirmed in Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112; Land Co. v. Griffey, 143 U. S. 32, 12 Sup. Ct. 362; Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856. The supreme court has decided, in many cases, that the withdrawal by the land department operated to exclude from sale, purchase, or pre-emption all lands embraced in such withdrawal or reservation, and that it also operated to exclude from the grant to a railroad company all lands so withdrawn or reserved, for any public purpose or use, at the time of the definite location of its line. Bullard v. Railroad Co., 122 U. S. 167, 7 Sup. Ct. 1149; U. S. v. Des Moines Nav. & Ry. Co., 142 U. S. 510, 12 Sup. Ct. 308. In the case last cited it is said:

"The validity of this reservation was sustained in the case of Wolcott v. Des Moines Co., 5 Wall. 681. In that case it was held that, even in the absence of a command to that effect in the statute, it was the duty of the officers of the land department, immediately upon a grant being made by congress, to reserve from settlement and sale lands within the grant; and that, if there was dispute as to its extent, it was the duty to reserve all lands which,

upon either construction, might become necessary to make good the purposes of the grant. This ruling as to the power and duty of the officers of the land department has been followed in many cases."

In the case of Hamblin v. Land Co., 147 U. S. 531, 536, 13 Sup. Ct. 353, it is said:

"A reservation by the interior department, it is well settled, operates to withdraw the land from entry under the pre-emption or homestead laws;" citing Wolcott v. Des Moines Co., 5 Wall. 681; Wolsey v. Chapman, 101 U. S. 755; Bullard v. Railroad Co., 122 U. S. 167, 7 Sup. Ct. 1149; U. S. v. Des Moines Nav. & Ry. Co., 142 U. S. 510, 12 Sup. Ct. 308.

These cases, and others to the same effect, establish the principle that the land department is invested with authority to withdraw or reserve public lands from sale, entry, or grant for the purpose of devoting them to some public purpose or use, in pursuance of an act of congress; and that the withdrawal of such lands at any time before the title to the lands attach, under a grant, by the definite location of a railroad line, excludes them from the mass of public lands upon which a legislative grant will operate. The reason is obvious. Otherwise a later grant might operate to defeat or impair the effect of a prior grant. Whenever congress makes a grant of public land in aid of a public improvement, it is not to be supposed that it was within the legislative intent to defeat or impair the full effect of the prior grant, unless such purpose is manifested in plain and unambiguous terms. When public lands have been segregated from the common mass by an act of congress, or by an order of the land department withdrawing them from entry or sale, for the accomplishment of some specific public purpose, it has never been held that such lands were embraced within the operation of a grant in aid of the construction of a railroad, should the order of withdrawal afterwards from any cause be revoked. Lands so reserved or withdrawn at the time of the definite location of a railroad line are not embraced within the terms of the grant. The grant, though made prior to the reservation, does not attach to lands withdrawn to satisfy an earlier grant, for the reason that they are excluded therefrom by the clear and explicit language of the act of congress.

It is argued that the fundamental error in the decision of the court below is in overlooking the fact that the earlier grant to the Omaha Company passed no title to, and made no grant of, the indemnity lands. It is true that no title to the indemnity lands could vest in the Omaha Company until such lands were located and selected, and such location and selection had been approved by the land department. But the earlier grant, while conveying no title to the indemnity lands, operated as a covenant or promise by the government to convey those lands, which bound it in good faith to do no act which would defeat or impair such covenant or promise. So far as the Pacific Company is concerned, it has no just ground of complaint; for, in reserving these lands for the benefit of the earlier grant, the land department has simply done what the plighted faith of the government required it to do. While the right to these indemnity lands rested in covenant or contract, it

imposed on the government a strong moral obligation to cause such acts to be done as would protect the just expectations of the Omaha Company from disappointment. And although the grant to the Pacific Company was one operating in praesenti, still its title did not, and by the express terms of the statute could not, attach to any specific lands, until the line of its definite location was fixed,— and then only to public lands, not reserved or otherwise appropriated. The lands in controversy, at the time of the definite location of its line, were reserved by competent authority, for the benefit of an earlier grant. and hence were not embraced within the operation of the grant to the Pacific Company. We have carefully examined all the authorities cited by counsel for the appellants, and find nothing in conflict with the views here expressed. The conclusion reached makes it unnecessary to consider the other questions presented. There is no error in the decree, and it will be affirmed, at the cost of the appellants.