William L. HAMERLY, Appellant,

v.

Daniel Webster DENTON, Appellee.

No. 47.

Supreme Court of Alaska.

Jan. 27, 1961.

John C. Hughes, Hughes & Thorsness, Anchorage, for appellant.

John M. Savage, Robison, McCaskey Savage & Lewis, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

DIMOND, Justice.

This is a controversy over a road which crosses Hamerly's property and gives access beyond to Denton's homestead. Hamerly objected to its use by Denton, and the latter, claiming it to be a public highway, brought an action to enjoin its obstruction. The district court entered judgment in Denton's favor, and Hamerly has appealed.

The question to be decided is whether this road is a "highway" within the meaning of Section 932, Title 43 U.S.C.A., which provides:

> "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted."

■■ The operation of this statute in Alaska has been recognized.[1] The territorial District Court and the highest courts of several states have construed the act as constituting a congressional grant of right of way for public highways across public lands. But before a highway may be created, there must be either some positive act on the part of the appropriate public authorities of the state, clearly manifesting an intention to accept a grant, or there must be public user for such a period of time and under such conditions as to prove that the grant has been accepted.[2]

■ It is not claimed that the road in controversy became a public highway by any act of the public authorities. Rather, it is contended that a highway was established by public use. Thus, in the court below Denton had the burden[3] of proving (1) that the alleged highway was located "over public lands"[4], and (2) that the character of its use was such as to constitute acceptance by the public of the statutory grant.

■ The term "public lands" means lands which are open to settlement or other disposition under the land laws of the United States. It does not encompass lands in which the rights of the public have passed and which have become subject to individual rights of a settler.[5] When a citizen has made a valid entry under the homestead laws, the portion covered by the entry is then segregated from the public domain. It has been appropriated to the use of the entryman, and until such time as the entry may be cancelled by the government or relinquished, the land is not included in grants made by Congress under 43 U.S.C.A. § 932.[6] Consequently, a highway cannot be established under the statute during the time that the land is the subject of a valid and existing homestead claim.[7]

■ The road involved in this case crossed land which was the subject of various homestead claims beginning in 1925 and ending in 1958 with the issuance of a homesite patent to Hamerly. The first entry was made by Murphy who filed his application for a homestead on November 28, 1925. He relinquished his claim on December 9, 1927 and then filed again on January 25, 1928. This latter entry was closed out by the land office on June 23, 1942.

The second entry was made by King who filed his application for a homestead on August 10, 1942. He relinquished his entry on November 19, 1946.

The next claimant was Hamerly who made his entry on March 8, 1948. This entry was closed out by the land office on November 7, 1955 for failure to meet the statutory requirements of cultivation. Hamerly filed a second homestead entry on January 11, 1956, and this entry likewise was closed out on June 18, 1956. On June 19, 1956 Hamerly filed a homesite entry to protect the house which he had built on the prop-

1. Berger v. Ohlson, D.C.D.Alaska 1938, 9 Alaska 389; Clark v. Taylor, D.C.D. Alaska 1938, 9 Alaska 298; United States v. Rogge, D.C.D.Alaska 1941, 10 Alaska 130.

2. See Berger v. Ohlson and Clark v. Taylor, supra note 1; Kirk v. Schultz, 1941, 63 Idaho 278, 119 P.2d 266; Leach v. Manhart, 1938, 102 Colo. 129, 77 P.2d 652; Lovelace v. Hightower, 1946, 50 N.M. 50, 168 P.2d 864; Hatch Bros. Co. v. Black, 1917, 25 Wyo. 109, 165 P. 518; State ex rel. Dansie v. Nolan, 1920, 58 Mont. 167, 191 P. 150; Montgomery v. Somers, 1907, 50 Or. 259, 90 P. 674.

3. See Korf v. Itten, 1917, 64 Colo. 3, 169 P. 148, 149.

4. 43 U.S.C.A. § 932.

5. Korf. v. Itten, supra note 3, 169 P. at pages 150–151; Bardon v. Northern Pacific R. Co., 1892, 145 U.S. 535, 12 S.Ct. 856, 36 L.Ed. 806.

6. Atchison, Topeka & Santa Fe R. Co. v. Richter, 1915, 20 N.M. 278, 148 P. 478, L.R.A.1916F, 969.

7. See: Atchison, Topeka & Santa Fe R. Co. v. Richter, supra note 6; Korf v. Itten, supra, note 3, 169 P. at pages 150–151; Bardon v. Northern Pacific R. Co., supra note 5; Red River and Lake of the Woods R. Co. v. Sture, 1884, 32 Minn. 95, 20 N.W. 229.

erty, and patent was issued to him on April 1, 1958.

Hence, from 1928 to 1958 there were four gaps in the possession of the land:

1. From December 9, 1927 to January 25, 1928.

2. From June 23, 1942 to August 10, 1942.

3. From November 19, 1946 to March 8, 1948.

4. From November 7, 1955 to January 11, 1956.

It was only during those periods of time that public use of the road could constitute acceptance of the grant made by 43 U.S.C.A. § 932. Use made of the road at other times when the land was the subject of existing homestead or homesite entries may not be considered. However, the court below held otherwise. It stated that—

> "\* \* \* it would seem that if the public had been using a particular route *during the period of the entry*, as soon as entry was closed out by the Bureau of Land Management a public highway would be created." (Emphasis added.)

In this, the court was in error. The question of whether a public right of way has been acquired must be determined by the conditions as they existed when action was taken to acquire the right of way. If the conditions were such that the lands were not public lands—having been taken up under homestead applications—then the congressional grant was not in effect. Public use of the road would be of no avail since there would be at that time no offer which the public could accept. The fact that the entries were later relinquished or cancelled would not change the condition so as to make the road a public highway at the time of relinquishment. The abandonment or cancellation of a homestead entry only brings the land within the category of public lands with reference to public use in the future.[8] Consequently, it must be deter-

mined whether during the gaps between entries there is evidence of public use sufficient to create a public highway.

The record shows that between 1927 and 1942 the road was used as follows: Charles Lechner, Jr., as a boy, had ridden a bicycle on the road occasionally between 1933 and 1936. Jack Werner had driven his car on the road one or two times to look at a cabin in 1941. Fred Kilcheski traveled on the road to visit Murphy (the first homestead entryman) in 1929. David Fleming had used the road in 1938 and 1939 for hunting and to cut poles to use as a framework for a boat skid.

Entryman King operated a pig farm on the property. During World War II he sold pigs to the Army, and Army trucks used the road to haul garbage for the pigs. Fred Kilcheski said that he saw the trucks using the road daily during the period of two weeks in 1943. Wesley Martin testified that he went to the pig farm once between 1940 and 1944 to buy a horse. Martin Goresen had walked to the pig farm once or twice between 1941 and 1943 out of curiosity. David Fleming had visited the pig farm many times out of curiosity.

This evidence is not enough to support a finding that a public highway was established. Murphy relinquished his first homestead claim in December 1927, and there was no evidence that the road was used at all between then and January 1928 when Murphy's second entry was made. The next "open" period was between June 23 and August 10, 1942, and there is no evidence of travel on the road during that specific period of time which could establish a public right of way.

The land was also open to the public from November 1946 to March 1948, and again from November 1955 to January 1956. But the evidence as to public use during those times is meager and far from convincing. Delbert Owen hunted in the area eight or ten times a year since 1947. During the spring and summer of 1947 Wayne Hein-

---

8. Korf v. Itten, supra note 3, 169 P. at page 151; Bardon v. Northern Pacific R. Co., supra note 5, 145 U.S. at page 538, 12 S.Ct. at page 857, 36 L.Ed. 809.

baugh drove over the road quite a few times as far as the hog ranch which was then abandoned. He didn't state what purpose he had in making these journeys. He also walked over the road in 1948, but apparently only once. James Forth was hunting rabbits in the area and went as far as the pig farm on two occasions in the fall of 1948. Martin Goresen estimated that he had used the road about twenty times between 1947 and 1954 for the purpose of trapping and hunting. Chris Sorenson recalled that as a sightseer he drove over the road on one occasion in 1947.

■ There simply is not enough evidence of public use to justify the lower court's finding that a public highway was created across Hamerly's homesite. During the periods that the land was not the subject of homesteaders' claims, its use was infrequent and sporadic. Those who did use the road had no real interest in the lands to which it gave access. They were merely sightseers, hunters and trappers. The road could not be considered as something that was either necessary or convenient for the accommodation of the public. Where there is a dead end road or trail, running into wild, unenclosed and uncultivated country, the desultory use thereof established by the evidence in this case does not create a public highway.[9]

Denton also claims that the public acquired a right of way by use of the road during periods when the land was in the possession of homestead claimants. He bases this argument on theories of dedication and adverse user.

■ There is dedication when the owner of an interest in land transfers to the public a privilege of use of such interest for a public purpose.[10] It is a question of fact whether there has been a dedication. This fact will not be presumed against the owner of the land; the burden rests on the party relying on a dedication to establish it by proof that is clear and unequivocal.[11]

■ It is true that the road was used during the tenures of homesteaders Murphy and King, between 1927 and 1942. But the road was initially established by these homesteaders for their own use. It had no other substantial use except when occasion made it convenient for persons to visit Murphy and King, either socially or for business purposes or simply out of curiosity. It cannot be implied from this that either Murphy or King intended to dedicate the road for public use. Nor can such intent be presumed from the fact that the homestead claimants apparently did not attempt to stop sightseers and hunters from occasionally using the road. Dedication is not an act or omission to assert a right; mere absence of objection is not sufficient.[12] Passive permission by a landowner is not in itself evidence of intent to dedicate.[13] Intention must be clearly and unequivocally manifested by acts that are decisive in character.[14]

■ Section 55–2–2, A.C.L.A.1949 prescribes a ten year period of limitation for actions brought to recover real property. While this statute purports only to bar a remedy, it may be used as the basis of establishing an easement of right of way across another's land.[15] Denton argues that such an easement was created by the desultory or occasional use made of the road by the

---

9. See Kirk v. Schultz, supra note 2, 119 P.2d at page 268; State ex rel. Dansie v. Nolan, supra note 2, 191 P. at page 152; Town of Rolling v. Emrich, 1904, 122 Wis. 134, 99 N.W. 464.

10. 6 Powell, Real Property § 934, at 346 (1958).

11. Id. § 935, at 352; Dugan v. Zurmuehlen, 1927, 203 Iowa 1114, 211 N.W. 986; People ex rel. Markgraff et al. v. Rosenfield, 1943, 383 Ill. 468, 50 N.E.2d 479, 482.

12. People ex rel. Markgraff, et al. v. Rosenfield, supra note 11, 50 N.E.2d at page 482.

13. Burk v. Diers, 1918, 102 Neb. 721, 169 N.W. 263, 265.

14. Dugan v. Zurmuehlen, supra note 11, 211 N.W. at page 988.

15. See Ringstad v. Grannis, 9 Cir., 1948, 171 F.2d 170, 173, 12 Alaska 190, 196.

public which extended over a period of more than ten years.

Use alone for the statutory period—even with the knowledge of the owner—would not establish an easement. When one enters into possession or use of another's property, there is a presumption that he does so with the owner's permission and in subordination to his title. This presumption is overcome only by showing that such use of another's land was not only continuous and uninterrupted, but was openly adverse to the owner's interest, i. e., by proof of a distinct and positive assertion of a right hostile to the owner of the property.[16] No such showing was made in this case. The evidence does not establish an easement by adverse use.

In support of the judgment below Denton asks this court to consider what he terms the "justice of the situation". He maintains that he must travel approximately one-eighth of a mile through Hamerly's property in order to have reasonable access to his homestead, and that his only other access is by a road which is approximately two miles long and which traverses the property of two or three other persons. It would be unjust, he maintains, to deny him the use of the road on Hamerly's property.

As authority for this theory Denton refers to a Colorado case [17] where, he states, the court expressly discussed and took into consideration in its decision the justice of the situation in a case very similar to this case.

It is true that the Colorado court found that there would be injustice in permitting a landowner to close a road crossing his property, because this would be of great damage to the individual who sought to use the road. But the court also said that this would be unjust because it would "deny to the public a right it is entitled to enjoy." [18] The court found that the road involved in that case was one over which the public

had been accustomed to travel for more than half a century, and that a highway had been established by public use under 43 U.S. C.A. § 932. Hence, if the public had acquired a right of way, justice would demand that the road be available for public use. That is a far different situation from that which exists here, where there had been insufficient use to establish a highway.

Denton had lived in the City of Seward, which is not far from the premises in controversy, since 1946. He had been in the vicinity of the road in controversy between 1946 and 1948 but had never used it during that period. He stated that the only person he had seen using it was Hamerly.

Denton applied for a 35 acre homestead in 1955, and he used the road once in that year to look the country over. In 1956 he made application for additional homestead acreage. In that year, and before he had done anything to create a habitable dwelling or otherwise improve his homestead, he discussed the use of the road with Hamerly, and was told that Hamerly did not want anybody using the road. Denton talked to Hamerly once again, but the parties could not reach any agreement on this point.

About six months later Denton attempted without success to obtain an easement from Hamerly. In 1958 he obtained a boxcar for conversion into a dwelling for himself and his family, and moved it across Hamerly's property with the latter's permission. For a few days after that he used the road until Hamerly objected. Denton then attempted to obtain permission from Hamerly to use the road for a period of sixty days, but no agreement was reached.

These incidents have significance. They establish that long before Denton took any action to establish a dwelling on his homestead, or did anything to develop it, he knew that there was a problem of obtaining access to his property and that he could not count on using the road crossing Hamerly's

16. Roberts v. Jaeger, D.C.D.Alaska 1914, 5 Alaska 190; Roediger v. Cullen, 26 Wash.2d 690, 175 P.2d 669, 678.

17. Leach v. Manhart, 1938, 102 Colo. 129, 77 P.2d 652.

18. Leach v. Manhart, supra note 17, 77 P.2d at page 654.

homesite. Denton could not have been misled by any action on Hamerly's part that the road was a public right of way. He nevertheless commenced his homestead settlement without making prior arrangements for adequate access other than by Hamerly's road. If Denton now suffers an inconvenience, this is of his own doing, and not Hamerly's. There is no injustice here. There would be injustice, however, if this court were to require Hamerly to divest himself of property rights in order to accommodate Denton where there is no legal or factual basis for the creation of an easement across his property.

Denton testified that because of Hamerly's actions he was obliged to expend money in constructing another road for access to his property. The district court found that he had suffered damages in the amount of $250, and awarded such damages against Hamerly on the basis of the latter's action in preventing Denton from using the road. Since this court has held that Hamerly's action in forbidding use of the road was not unlawful, that portion of the findings and judgment below are without factual or legal basis.

 Hamerly testified that he had placed a wire fence across the road and that on two occasions Denton had cut it. The second time this happened, Hamerly fired a rifle in Denton's general direction, but without hitting him. The court below found that Denton was entitled to the sum of $100 for a wrongful assault made by Hamerly and to punitive damages in the sum of $1.00.

There was no proof, however, that Denton suffered any injury, either physical or arising from mental suffering and fright. In fact, he never mentioned the incident in his testimony. Consequently, there was no basis for the $100 award which presumably represented actual or compensatory damages for the assault.

There also was no basis for the award of punitive damages. Although this court does not condone Hamerly's attempt to take the law into his own hands, it is disinclined to depart from the general rule that the right to punitive damages is dependent upon the right to recover compensation for actual injury.[19]

Finally, the court awarded Denton attorney's fees in the sum of $250, plus costs. In view of the conclusions reached here, this portion of the judgment must also be set aside.

The judgment of the district court is reversed, and the case is remanded to the Superior Court, Third District, for proceedings that may be necessary in conformity with this opinion.

---

19. See Annotation, 1951, 17 A.L.R.2d 527.