Ruth BARKER and William T. Stephens, Jr., Trustee of the Thomas W. Sefton Trust, Plaintiffs,

v.

The BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LA PLATA, COLORADO, Tom Henderson, The United States Forest Service, Theodore Levin and Pamela S. Levin, Seymour L. Gross and Elaine L. Gross, Ronald S. Shafer and Georgia G. Shafer, John H. Miller and Barbara C. Miller, Donald L. Briggs, Berna Deane–Briggs, Nila Gaye Briggs Sterns, Donald Earl Briggs, Jason Edward Briggs and Ronald L. Enge, The Heirs of Reese McCloskey, Vincent Walker Perini, Frank Thomas Perini, Charles Whittling Perini, and All Unknown Persons Who Claim Any Interest in the Subject Matter of this Action, Defendants.

No. Civ.A. 97–B–1912.

United States District Court,
D. Colorado.

May 18, 1999.

William E. Zimsky, Abadie & Zimsky, Durango, CO, for plaintiffs.

Jeffrey P. Robbins, Michael McLachlan, Goldman, Robbins & Rogers, LLP, Durango, CO, L.W. McDaniel, McDaniel, Baty & Miller, Durango, CO, Ted C. Wright, Durango, CO, Helena Jones, U.S. Dept. Of Agriculture, Lakewood, CO, Stephen D. Alfers, Craig R. Carver, Alfers & Carver, LLC, Denver, CO, Fred C. Kuhlwilm, David Reese Miller, Semple, Miller, Delay & Mooney, P.C., Denver, CO., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BABCOCK, District Judge.

### I. PROCEDURAL HISTORY

Plaintiff Ruth Barker commenced this quiet title action on May 8, 1997 in the District Court for the County of La Plata, Colorado. She filed a second amended complaint on August 15, 1997, alleging four claims: (1) quiet title (against all defendants); (2) declaratory relief (against all defendants); (3) injunctive relief (against the Division of Wildlife of the State of Colorado); and (4) temporary inverse condemnation (against the Board of County Commissioners of La Plata County, Colorado). Mrs. Barker contends that Lewis

Creek Road, which is located within La Plata County, is private where it crosses her three mining claims. On August 21, 1997, Mrs. Barker filed a motion for preliminary injunction seeking to enjoin the Board of County Commissioners of La Plata County ("the County"), the United States Forest Service ("the Forest Service"), and the Division of Wildlife of the State of Colorado ("the CDOW"), from interfering with her construction and maintenance of a gate across Lewis Creek Road. The Forest Service removed the action to this Court on September 3, 1997. During a scheduling conference held January 30, 1998, pursuant to Rule 65(a)(2), Mrs. Barker, the County, the Forest Service, and the CDOW stipulated to consolidation of the preliminary injunction hearing with trial on the merits. By written order and stipulation, I dismissed the CDOW from this action on April 10, 1998.

In her original and amended complaints, Mrs. Barker named Thomas W. Sefton as a defendant. On November 26, 1997, William T. Stephens, Jr., as Trustee of the Thomas W. Sefton Trust ("the Sefton Trust"), filed an answer, as well as a cross claim against all defendants. That answer avers that the entirety of Lewis Creek Road is private. By written order entered on November 28, 1997, the Sefton Trust was substituted for Thomas W. Sefton. By written order entered on August 14, 1998, the Sefton Trust was re-aligned and became a named plaintiff.

On October 23, 1998, Mrs. Barker filed a supplemental motion for default judgment and, on the same day, I entered default judgment against defendants Tom Henderson, Theodore Levin, Pamela S. Levin, Seymour L. Gross, Elaine L. Gross, Ronald S. Shafer, Georgia G. Shafer, John H. Miller, Barbara C. Miller, and all unknown persons who claim any interest in the subject matter of this action ("the defaulting defendants"). Although that default judgment declares that the defaulting defendants have "no right, title, or interest in the real property that is the subject of this quiet title action," that default judgment applies to only the claims of Mrs. Barker against the defaulting defendants. Indeed, the Sefton Trust never moved for default judgment against the defaulting defendants.

On December 4, 1998, the following parties entered into a settlement stipulation: the Sefton Trust, the Heirs of Reece McCloskey ("the heirs of McCloskey"), defendants Donald L. Briggs, Berna Deane–Briggs, Nila Gaye Briggs Stearns, Donald Earl Briggs, Jason Edward Briggs, and Ronald L. Enge (collectively, "the Briggs"), the County, and the Forest Service. On December 21, 1998, defendants Vincent Walker Perini, Frank Thomas Perini, and Charles Whitling Perini (collectively, "the Perinis"), owners of mining claims along Lewis Creek Road, filed an objection to certain language of that settlement stipulation. I discuss the Perinis' objections below.

A three-day trial to court was held on December 7, 8, and 9, 1998 in Durango, Colorado. Mrs. Barker, the County, the Briggs, and the Forest Service appeared, through their respective counsel, to represent their interests. Upon conclusion of that trial, I took the matter under advisement. I now enter the findings of fact, conclusions law, and order set forth below. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1442 & 2409a (1997).

## II. FINDINGS OF FACT

Lewis Creek Road (sometimes referred to herein as "the road") is located within a remote area of the San Juan National Forest, approximately 22 miles from Durango, Colorado. The road begins at County Road 124, also known as La Plata Canyon Road. From its junction with La Plata Canyon Road at approximately 9,400 feet above sea level, Lewis Creek Road winds approximately 3 ⅛ miles in an easterly direction towards Eagle Pass, which is located on the north-south ridge line of Lewis Mountain at approximately 11,700 feet above sea level. (Govt. Ex. A17 (depicting elevation).) Lewis Creek Road then continues 1 mile down the eastern side of the

north-south ridge line of Lewis Mountain, where it terminates at a dead-end. The road traverses public land within the San Juan National Forest, as well as several privately-owned mining claims. (Govt. Exs. C (attached hereto)), A17 (depicting location of Lewis Creek Road and mining claims along the road.) The portion of the San Juan National Forest through which Lewis Creek Road traverses became part of the national forest reserve on June 13, 1905 by Presidential proclamation. The road becomes impassable during the winter, except by snowmobile, cross-country skis, and snowshoes. Generally, people only travel the road during the summer months, when the road is negotiable by foot, horseback, mountain bicycle, and motorized vehicles.

As one ascends Lewis Creek Road in an easterly direction from its junction with La Plata Canyon Road, one traverses the following privately-owned mining claims in succession: Barnagatt Mill Site (owned by the heirs of McCloskey), Flying Swede (owned by the Sefton Trust), Terrible Swede (owned by the Sefton Trust), Jim (owned by Seymour L. Gross and Elaine L. Gross), Independence (owned by Seymour L. Gross and Elaine L. Gross), Bonanza (owned by Ronald S. Schafer, Georgia G. Schafer, John H. Miller, and Barbara Miller), Kolibri (owned by Mrs. Barker and the Sefton Trust), again Bonanza, Brawner (owned by the Perinis), Bonanza Extension (owned by Mrs. Barker), Eagle Pass (owned by Mrs. Barker), and Eureka Lode (owned by Mrs. Barker). (Govt.Exs. C, A17.) Lewis Creek Road provides access to, but does not traverse, American Flag (owned by Theodore Levin and Pamela S. Levin) and Gold King (owned by the Briggs), which are situated on the western side of Eagle Pass.

As one descends Lewis Creek Road on the eastern side of Eagle Pass, one is able to access and/or traverse the following mining claims: Eagle Pass and Bonanza Extension (owned by Mrs. Barker), as well as Ashland Lode, Parole No. 2 Lode, Sylvan No. 2 Lode, Ten Broeck Lode, Parole Extension Lode, Durango Girl Lode, and New Hope Lode (owned by the Perinis). The Eagle Pass and Bonanza Extension mining claims straddle Eagle Pass and, therefore, are located on both the western and eastern sides of Eagle Pass.

Chester "Bud" Steward, born in La Plata County on September 9, 1924, frequently traveled Lewis Creek Road during the 1930's, 1940's, and 1950's. His family owned the Steward Ranch, which currently encompasses approximately 1,300 acres in La Plata County. His father, Glen Steward, and uncles, Dean and Fay Steward, (collectively, "the Steward brothers") were in the mining business during the 1930's and owned, at one time or another, many of the mining claims situated near Eagle Pass.

Beginning in 1938, Bud Steward hunted in the area of Eagle Pass. Bud Steward testified credibly that, sometime before 1953, the owners of the Gold King Mine built a road from La Plata Canyon Road to the Gold King Mine. (Govt. Ex. A25, Bottom Picture (showing Gold King Mine); Govt. Exs. A, C (depicting location of Gold King Mining claim).) Charles Whitling Perini, whose family owns the Brawner mining claim on the western side of Eagle Pass and several mining claims on the eastern side of Eagle Pass, testified that a road existed from the junction with La Plata Canyon Road to the Terrible Swede mining claim and, thereafter, a "pack trail" ascended to Eagle Pass. He also testified credibly that, by 1927, the road had been extended to the Gold King Mine. His testimony corroborates Bud Steward's testimony regarding the extension of the road to the Gold King Mine. I find, therefore, that, as early as 1927, Lewis Creek Road extended to the Gold King Mine.

The location of the Gold King Mine was the subject of various opinions during trial. Nearly all witnesses asked about the location of the Gold King Mine testified that it is situated to the south of Lewis Creek Road near the three-corner intersection of the Independence, Bonanza, and Gold

King mining claims. (Govt.Ex. C.) Yet Robert W. Blair, Jr., a geology professor at Fort Lewis College in Durango who has training in the interpretation of topographic maps and aerial photographs and is qualified as an expert in the field of aerial photographic interpretation and topographic map interpretation, opined that the Gold King Mine is not located near the three-corner intersection of the Independence, Bonanza, and Gold King mining claims, but rather to the west on the Jim mining claim. Dr. Blair, however, concedes that he never traveled Lewis Creek Road in person because his opinion was not sought until one month before trial, at which time the area was snowed-in. He bases his opinion regarding the location of the Gold King Mine, therefore, solely on the following evidence: seven aerial photographs taken between 1956 and 1964, (Govt. Exs. T, U, V, W, X, Y, & Z), one panoramic land-based photograph taken on an unidentified date, (Govt.Ex. A1), a United States Geological Survey topographic map published in 1963, (Govt.Ex. A31), a 1949 United States Geological Survey publication known as "Professional Paper 219" which contained a topographical map, and a United States Geological Survey topographic map published in 1895. Dr. Blair's opinion regarding the location of the Gold King Mine is contradicted by the weight of the testimony and by the testimony of those who have visited the area in person on multiple occasions. I find, therefore, that the Gold King Mine is located on the southern side of Lewis Creek Road near the three-corner intersection of the Independence, Bonanza, and Gold King mining claims.

In 1953, the Steward brothers extended Lewis Creek Road to the Brawner Tunnel, which is located on the Brawner mining claim. (Govt.Exs.A, C.) In 1954, Bud Steward helped his uncles extend the road from the Brawner Tunnel to the headwaters of Lightner Creek, which is southeast of Eagle Pass and near Walls Gulch. (Govt.Exs.A, C.) He testified credibly that, after they completed the second extension of Lewis Creek Road in 1954, they erected a metal cable near the Gold King Mine which, when locked, blocked motor vehicles from traversing the road beyond that location. The metal cable served multiple purposes, including keeping people from trespassing and away from blasting areas where they could be harmed by flying rocks and other debris.

Before Lewis Creek Road was constructed and extended, those traveling to the top of Eagle Pass used what is commonly referred to as "Eagle Pass Trail." The Perinis or their predecessors in title began using Eagle Pass Trail to access their claims beginning in 1883 when the Ashland–Ten Broeck Mine commenced operations. They also used the road to access the New Hope and Durango Girl Mines beginning in 1893. (Pretrial Ord. of 10/29/98 at 8.) Bud Steward traveled Eagle Pass Trail a few times during the 1930's and 1940's, usually with burrows. According to him, Eagle Pass Trail is steep, has many switchbacks, and is too narrow for two packed burrows to walk side-by-side. Miners, sheepherders, sheep, deer, and elk frequently used the trail before the construction of Lewis Creek Road. Yet after the construction and extension of Lewis Creek Road, Eagle Pass Trail became disfavored by most human travelers. Portions of Eagle Pass Trail have been obliterated by winter snowslides, earthslides, erosion, and growth of flora.

Dr. Blair examined the geography of Lewis Creek Road in "stereo vision," again using seven aerial photographs taken between 1956 and 1964, (Govt. Exs. T, U, V, W, X, Y, & Z), one panoramic land-based photograph taken on an unidentified date, (Govt.Ex. A1), a United States Geological Survey topographic map published in 1963, (Govt.Ex. A31), a 1949 United States Geological Survey publication known as "Professional Paper 219" which contained a topographical map, and a United States Geological Survey topographic map published in 1895. He constructed a transparent overlay depicting what he believed to be the location and course of Lewis Creek

Road and Eagle Pass Trail as they existed in the 1950's and 1960's. (Govt. Ex. A45 (overlaying Govt. Ex. Z).) He concludes that: (1) approximately $\frac{7}{10}$ of a mile, or 40%, of Lewis Creek Road from the Gold King Mine to near the summit of Eagle Pass deviates from the original Eagle Pass Trail by a maximum of 30 feet; (2) the remaining $\frac{9}{10}$ of a mile, or 60%, of Lewis Creek Road from the Gold King Mine to near the summit of Eagle Pass deviates from the original Eagle Pass Trial by a maximum of 500 feet, but follows it "in a general way;" (3) the average grade of Lewis Creek Road as it existed in the early 1950's is approximately 14%; and (4) the average grade of the Eagle Pass Trail is at least 20%. Although he testified on direct examination that Lewis Creek Road and Eagle Pass trail end at the same place, he clarified during cross-examination that Eagle Pass Trail heads in an easterly direction across the Bonanza Extension mining claim and over the summit of Eagle Pass, whereas the 1954 extension of Lewis Creek Road traverses the Bonanza Extension mining claim parallel to the north-south ridge line of Lewis Mountain, thereby avoiding the steep grade of Eagle Pass by traversing around, and to the south, of Eagle Pass. He further conceded that: (1) his conclusions would be more accurate if he had visited the site in person; (2) there could be trails that intersect the Lewis Creek Road which did not appear through stereoscopic analysis; (3) the majority of the extension of Lewis Creek Road built in 1953 and 1954 does not follow substantially the same path as Eagle Pass Trail; (4) parts of the tree canopy could have obscured Eagle Pass Trail; (5) the original Eagle Pass Trail never crossed the Eureka mining claim; (6) if a trail had not been used very extensively for a period of time, it would be harder to discern by stereoscopic analysis; (7) construction of the road might have obliterated portions of the Eagle Pass Trail; and (8) he is unable to determine certain portions of Eagle Pass Trail from aerial photographs.

Based on his testimony, as well as the testimony of others, I find that Lewis Creek Road, from the Gold King Mine to where it diverges from Eagle Pass Trail immediately to the west of Eagle Pass on the Bonanza Extension mining claim, follows substantially the same path as Eagle Pass Trail. However, I also find that Lewis Creek Road, from where it crosses Eagle Pass Trail immediately to the west of Eagle Pass on the Bonanza Extension mining claim to where it crosses Eagle Pass Trail immediately to the east of Eagle Pass, does not substantially follow same path as Eagle Pass Trail. Indeed, the 1954 extension of Lewis Creek Road was constructed to avoid the steep grade found at the summit of Eagle Pass and, therefore, loops around Eagle Pass to the south with more gradual gains and losses of elevation. (Govt. Ex. A23, Middle Picture (depicting gate at junction of Lewis Creek Road and Eagle Pass Trail immediately to the west of Eagle Pass); Govt. Ex. A28 at 16, Bottom Picture (depicting same gate, Eagle Pass, and north-south ridge line of Lewis Mountain).) I further find that Lewis Creek Road follows substantially the same path as Eagle Pass Trail on the Bonanza Extension mining claim, but not the Eagle Pass or Eureka mining claims. These findings are supported by the map published in 1895, (Plf.'s Ex.11), the testimony of Bud Steward, Charles Whitling Perini, E.T. Barker, (Plf.'s Ex. 15 (depicting his approximation of Eagle Pass Trail)), and Dr. Blair. (Govt. Ex. A45 (Dr. Blair's interpretation of the locations of Eagle Pass Trail and Lewis Creek Road).)

Bud Steward traveled Eagle Pass Trail or Lewis Creek Road nearly every year from the mid–1950's to the mid–1970's. During his travels up the road, he always observed a cable near the Gold King Mine, which was locked unless a vandal had broken the lock or his uncles were working the mines. Bud Steward was in Canada from 1974 to 1980, but then returned to La Plata County. In 1980, he built a bridge on Lewis Creek Road near its junction with La Plata Canyon Road. (Govt. Ex. A28 at 1, Bottom Picture (depicting bridge).) He also "did some tunneling" for

Emzy Barker in the summer of 1980, during which time he again observed a locked cable near the Gold King Mine.

Emzy Barker, plaintiff Ruth Barker's husband, purchased several mining claims from Burt Thompson and/or the Steward brothers in 1973 or 1974. Specifically, Emzy Barker purchased the Bonanza Extension, Eagle Pass, and Eureka mining claims, described as follows:

BONANZA EXTENSION LODE MINING CLAIM, Survey No. 20371, California Mining District, La Plata County, Colorado, LESS AND EXCEPT all that portion embraced in the Good Hope Lode Mining Claim, Survey No. 4874 and all that portion embraced in the Eagle Pass Lode Mining Claim, Survey No. 6124.

EAGLE PASS MINING CLAIM, Survey No. 6124, California Mining District, La Plata County, Colorado, LESS AND EXCEPT all that portion embraced in the Good Hope Lode Mining Claim, Survey No. 4874.

EUREKA MINING CLAIM, Survey No. 1271, California Mining District, La Plata County, Colorado.

Thereafter, the Barkers had their own key to the lock securing the metal cable. Emzy Barker died in 1991. Ruth Barker succeeded to his interests in those mining claims by inheritance.

E.T. Barker and Barry Barker are the sons of Emzy and Ruth Barker. E.T. Barker first saw Lewis Creek Road in the summer of 1957, when he visited La Plata County with his father. He traveled Lewis Creek Road two or three times during a two-week period in 1957. He testified that each time he traveled the road during that time, he had to unlock the cable erected by the Steward brothers near the Gold King Mine. When locked, the cable prevented motor vehicles from passing. In 1958, and then from 1963 to 1974, E.T. Barker returned to La Plata County during the summer months. He again observed one or more locked cables blocking passage to Lewis Creek Road above the Gold King mine. Occasionally, the metal cables were

unlocked, but only because the Steward brothers were working mines above the cables. E.T. Barker testified credibly and, therefore, I find that the Barkers' predecessor in interest maintained a locked cable blocking Lewis Creek Road near the Gold King Mine in 1957.

Beginning in 1981, and continuing through 1984, Emzy Barker conducted exploration and other mining activities in the area. Whenever he was working on various claims above the cable near the Gold King Mine, he did not lock the cable because he was able to confront anyone he thought should not be there. Otherwise, he locked the cable during those years. Occasionally, however, unidentified people would cut the cable to gain access to the areas above its location. Emzy Barker rebuilt and maintained the cable near the Gold King Mine until the 1980's, when one of the pine trees anchoring the cable died. Emzy Barker then erected a new cable across Lewis Creek Road approximately 300 yards above the original cable. The second cable still exists today, although it is unclear whether that gate is locked. (Govt. Ex. A28 at 5, Top Picture.)

During the 1980's, the Barkers also maintained a metal frame gate located above the second cable and near a cabin on the Kolibri mining claim. The metal frame gate was frequently torn down by unidentified people. The Barkers erected the last metal frame gate at that location in the late 1980's, the remnants of which remain today. (Govt. Ex. A22, Bottom Picture; Govt Ex. A28 at 8, Top and Bottom Pictures.) After Emzy Barker died, Barry Barker oversaw the Barker mining claims and erected gates to keep others from vandalizing or stealing property. E.T. Barker visited the Barker mining claims nearly every year from 1990 to 1998, during which visits he saw the Barker's gates either locked or cut down. In 1997, the Barkers erected another metal frame gate on Lewis Creek Road where it traverses the Bonanza Extension mining claim on the west side of Eagle Pass.

(Govt. Ex. A23, Middle Picture (depicting gate at junction of Lewis Creek Road and Eagle Pass Trail immediately to the west of Eagle Pass); Govt. Ex. A28 at 16, Bottom Picture (depicting same gate, Eagle Pass, and north-south ridge line of Lewis Mountain); Govt. Ex. C.) The Barkers never ran livestock in the area and the cables and gates they erected throughout the years served no purpose except to keep others away from their mining claims.

While some inhabitable improvements exist along Lewis Creek Road, those improvements are not located on the Bonanza Extension, Eagle Pass, or Eureka mining claims. (Govt. Ex. A24, Top Picture (depicting a cabin on Chippewa mining claim near the Barnagatt Mill Site at the bottom of Lewis Creek Road); Govt. Ex. A28 at 6, Top Picture (depicting a cabin on the Kolibri mining claim); Govt. Ex. A22, Picture Second from Bottom (same); Govt. Ex. A27 at 1, Top and Bottom Pictures (same).) The cabin on the Kolibri mining claim, which is jointly owned by the Sefton Trust and Mrs. Barker, was built in 1950 or 1951 by the Steward brothers. The Steward brothers inhabited that cabin during portions of the 1950's, 1960's and 1970's until they sold it in 1974. While Emzy Barker conducted mining activities during the 1980's, he also used that cabin. No one has lived in that cabin during recent years. John Ferguson, a mining contractor who has worked in the area, testified that a cabin was also built on the Flying Swede mining claim in 1959 and subsequently remodeled in 1998. As noted above, the Flying Swede mining claim is owned by the Sefton Trust. Lastly, the Briggs own a cabin on the Gold King mining claim, which was constructed in 1974 and his been used frequently since its construction. Several uninhabitable improvements also exist along Lewis Creek Road, some of which are in extreme disrepair. (Govt. Ex. A28 at 6, Top Picture ("lean-to" covering engine on the Kolibri mining claim); Govt. Ex. A22, Top Picture (same); Govt. Ex. A27, Bottom Picture (entrance to Brawner Tunnel); Govt. Ex.

A28 at 13, Top Picture ("lean-to" on the Eagle Pass mining claim).) Based on this evidence, I find that the Bonanza Extension, Eagle Pass, and Eureka mining claims have been vacant, unenclosed, and unoccupied since at least 1954, the date Lewis Creek Road was extended from the Brawner Tunnel to the headwaters of Lightner Creek near Walls Gulch. I also find, however, that the Kolibri mining claim was occupied during the summer months from 1950 or 1951 through the late 1980's.

Several witnesses testified that their access to Eagle Pass was not blocked by a cable or gate during the 1950's, 1960's, and early 1970's. These witnesses are Gilbert R. Slade (who traveled Lewis Creek Road during the 1940's and early 1950's when helping his father with a herd of sheep that ranged in the vicinity of the road), John Ferguson (who ascended Lewis Creek Road approximately once each year between 1954 and 1956, and between 1959 and 1970), Thomas E. Price (who traveled Lewis Creek Road to the top of Eagle Pass approximately once or twice each year from 1954 to the "real early" 1970's), Woodrow Weaver (who used Lewis Creek Road approximately five times from 1955 to 1970), Prescott Blake (who traveled Lewis Creek Road during the 1960's, usually ascending to the top of Eagle Pass, and did not encounter any cables or gates until the late 1960's), and Stanley Eugene Austin (who first traveled the road intermittently between 1956 and 1972, usually ascending to the summit of Eagle Pass). I find, however, that their testimony does not directly conflict with the testimony of Bud Steward, who testified that a locked cable was erected near the Gold King Mine in 1954. Nor does their testimony directly conflict with the testimony of E.T. Barker, who observed a locked cable in 1957. As noted above, the cables were often unlocked by the Stewards or Emzy Barker during the summer months when recreational users would have traversed Lewis Creek Road. Moreover, the cables were frequently cut or destroyed by vandals and

users of the road. If unlocked or destroyed, the cables would likely be unnoticeable. (Compare Govt. Ex. A28 at 5, Top Picture (showing taught cable above the Gold King Mine), with Govt. Ex. A28 at 5, Bottom Picture (showing same location with unlocked cable).)

I also find that the Barkers blocked Lewis Creek Road by cable or gate from 1974 until the present. This finding is supported by the testimony of Ruth Barker, Bud Steward, E.T. Barker, Barry Barker, and Prescott Blake, who testified that they encountered a locked cable or gate beginning in the late 1960's or early 1970's. Others encountered locked cables and/or gates in the 1980's and 1990's: John Ferguson (who first noticed a locked cable or gate in 1981 or 1982 below the Brawner mining claim), Paul Peck (an employee of the United States Forest Service who encountered a locked gate in August 1995 or August 1996), Michael G. Johnson, (District Ranger for the Columbine Ranger District for the last four years, who encountered a locked gate along Lewis Creek Road in 1995), Woodrow Weaver (who, on several occasions between 1986 and 1997, encountered locked gates, locked cables, or unlocked cables "just laying there"), Berna Deane Briggs (who remembers encountering a locked chain sometime after 1972), Thom Mayes, Jr. (who encountered a locked cable near the Gold King Mine, or a metal frame gate, from 1983 to 1998), Lloyd McNeil (who, from 1980 through the early 1990's, encountered a locked cable near the Gold King Mine and/or a locked gate near the cabin on the Kolibri mining claim), Harley K. Sefton (a beneficiary of the Sefton Trust who frequented the area during the 1960's and 1970's and does not recall a blockage along that road, by cable, gate, or otherwise, until 1974 or 1975, when the Barkers started cabling or gating parts of the road near the Brawner Tunnel), and Charles Whitling Perini (who traveled Lewis Creek Road during the early 1950's and then not until 1979, but noticed a cable blocking the road in 1979). Indeed, the Forest Service and the County conceded during trial that a cable or gate existed in 1974.

Larry D. Gash, an employee of the United States Forest Service who specializes in special uses and rights-of-way, reviewed mineral survey plats for the area and estimated the approximate entry dates, location dates, dates of survey, and dates of patent under the General Mining Act of 1872 for 28 mining claims, including the Bonanza Extension, Eagle Pass, and Eureka mining claims. (Govt. Exs. 50 & 51.) According to his calculations, which estimate that the entry date is four years before the survey date, the approximate entry dates for the Bonanza Extension, Eagle Pass, and Eureka mining claims are 1926, 1885, and 1879, respectively. I find those estimates accurate and, consequently, I presume that entry occurred during those respective years.

Richard A. Bell, a staff officer for the Columbine Ranger District of the United States Forest Service for the last four years, researched the chain of title for the Kolibri mining claim, leading him to conclude that "the Barker family" owns a 15 acre interest in the surface rights and a 5 acre interest in the mineral rights. (Govt.Exs.A55, A57–A59.) The certified copies of the deeds indicate, however, that Emzy Barker is the last-named title-holder of those interests. (Govt.Ex. A59.) Thus, based on trial testimony, Ruth Barker succeeded to those interests and is the current title-holder. Despite her interest in the Kolibri mining claim and the cabin situated thereon, Mrs. Barker does not seek to quiet title to Lewis Creek Road where it traverses that mining claim. Rather, she seeks to quiet title to Lewis Creek Road where it traverses the Bonanza Extension, Eagle Pass, and Eureka mining claims.

Mr. Bell also researched the "BLM status archives," which provide independent confirmation of the accuracy of the patent and estimated entry dates compiled by Mr. Gash for the 28 mining claims. (Govt. Exs. 50 & 51.) He also conducted re-

search regarding the most likely route miners would have traveled to access the 28 mining claims. He first concluded that the likely supply sources were Durango, La Plata City, Mayday, Parrott City, and Hesperus. Considering the elevation, distance, location of mill sites, and the availability of supplies and rail service, he concludes that miners attempting to access the 28 mining claims around Eagle Pass before 1905 probably traveled east from La Plata City, Mayday, Parrott City, or Hesperus, rather than northwest from Durango. That eastern path would have taken them up a travelway in substantially the same location as certain portions of present-day Lewis Creek Road. His review leads him to conclude that a map published in 1911 does not depict a travelway along Lewis Creek. (Govt.Ex. I.) A map published in 1917 shows a travelway along Lewis Creek, but indicates that the travelway ends near Ashland Gulch, which intersects the Flying Swede mining claim. (Govt.Ex. J.) He also testified that a 1928 map shows a travelway along Lewis Creek, depicting that travelway as terminating along the north-south ridge line of Lewis Peak. (Govt.Ex. K.) That map compels Mr. Bell to conclude that, assuming the location of Eagle Pass Trail is similar to the location of present-day Lewis Creek Road, Eagle Pass Trail probably traversed the Bonanza Extension mining claim before entry occurred. Although a 1928 survey of the Bonanza Extension mining claim does not show a trail crossing that claim, (Plf.'s Ex.6), and although surveys of the Bonanza and Gold King mining claims depict trails, he notes that there was no requirement that the survey show every topographic detail. Rather, only topographic details material to the survey, which do not necessarily include trails, roads, or other travelways, must appear on the survey. I find his conclusions credible and supported by the evidence.

After a public hearing held on September 8, 1976, the County adopted Resolution No.1976-84. That Resolution states, in relevant part:

WHEREAS, C.R.S.1973 43-2-101 provides that a County shall adopt an official road map of the County establishing a County road system; and,

WHEREAS, certain changes have been made to the County road system warranting a new map; and,

WHEREAS, a public hearing was held on September 8, 1976 for the purposes of adopting an official County road map designating primary and secondary roads for the County of La Plata; and,

WHEREAS, such hearing was held as required by law; and,

WHEREAS, at such hearing a proposed County road map was introduced into evidence; and,

WHEREAS, various people appeared to testify concerning the public uses of the road commonly known as Louis [sic] Creek Road; and,

WHEREAS, the Commissioners considered all of the evidence concerning the Louis [sic] Creek Road and found that from the testimony it has been openly, notoriously and adversely used without interruption or objections on the part of the owners of such lands for a consecutive period in excess of twenty (20) years by the public and should be considered a public road and should be made a part of the County road system.

NOW, THEREFORE, BE IT RESOLVED that the new official County road map, marked Exhibit "A" and attached hereto, shall be accepted by the County of La Plata and that all roads showing thereon shall become part of the County road system.

BE IT FURTHER RESOLVED that there was sufficient evidence established that the Louis [sic] Creek Road was open to the public and used by the public for a least twenty (20) consecutive years and that a proportion [sic] of Louis [sic] Creek Road extending from the existing County road to the top of Eagle Pass shall be considered as a public road and a County road and that such road shall be maintained by the

United State's [sic] Forest Service under a road maintenance agreement.

(Resolution No.1976–84 of 9/21/76, Ex. 2 of Barker Mot. for Summ.J. of 2/19/98.) On October 20, 1981, the County adopted Resolution No.1981–86, which states in relevant part:

WHEREAS, La Plata Canyon Road, also designated as county Road 124, is on the County Road System and is maintained by La Plata County to the Gold King Mine turnaround, being a distance of approximately 7.0 miles from the junction of County Road 124 and U.S. Highway 160, and

WHEREAS, jurisdiction over the continuation of County Road 124 from the Gold King Mine turnaround to Kennebec Pass, a distance of approximately 7.5 miles, is vested in the Board of County Commissioners of La Plata County, and

WHEREAS, the Lewis Creek Road, also known as County Road 124–A, being a road approximately 2.8 miles in length, extending easterly from its junction with the La Plata Canyon Road, said junction being located approximately 0.3 miles north of the Gold King Mine turnaround, is likewise a public highway with jurisdiction over same being vested in the Board of County Commissioners, and

WHEREAS, the Untied States Forest Service has expressed a desire to provide maintenance of said roads, subject to the availability of funds, men, and equipment, said maintenance being performed during the summer months, and

WHEREAS, it is necessary that the Board of County Commissioners grant to the United States Forest Service authority to so maintain said roads,

NOW, THEREFORE, BE IT RESOLVED:

1. The United States Forest Service is hereby authorized to maintain the La Plata Canyon Road north of the Gold King Mine turnaround and the Lewis Creek Road, both as herein described.

2. Said maintenance shall be performed entirely at the cost of the United States Forest Service, and the United States Forest Service shall employ such monies, men, and equipment as it sees fit in said maintenance.

(Resolution No.1981–86, Ex. R of Forest Serv.Resp. of 10/6/98.)

On September 2, 1998, Mrs. Barker and the County entered into a stipulation regarding the legal effect of Resolution 1976–84. The Forest Service is not a party to the stipulation. It states, in relevant part:

... Resolution 1976–84 does not, standing alone, render the road public pursuant to C.R.S. § 43–2–201(1)(c). However, the Resolution establishes that, as a matter of law, from the date of its enactment, September 21, 1976, any public use of the road without the permission of the private landowners was open, notorious and adverse to the private landowners and, that since the date of its enactment all subsequent public use, if any, has been adverse to the private landowners. *Board of County Com'rs for Garfield County, Colo. v. W.H.I., Inc.,* 992 F.2d 1061, 1066 (10th Cir.1993.)

\* \* \* \* \* \*

... Plaintiff and Defendant Board of County Commissioners of La Plata County, Colorado further stipulate that the Court, if it is so inclined, may grant Plaintiff's Motion for Partial Summary Judgment by entering an Order incorporating the above stipulated agreement....

(Joint Stipulation of 9/2/98.) Although the Forest Service is not a party to that stipulation, the Forest Service effectively joined the stipulation in the pretrial order entered October 29, 1998. (Pretrial Ord. of 10/29/98 at 8; Mem. Opinion and Ord. of 11/12/98.)

### III. CONCLUSIONS OF LAW

In support of their contention that Lewis Creek Road is public where it traverses the Bonanza Extension, Eagle Pass, and Eureka mining claims, the Forest Service

and the County offer three alternative arguments. First, the Forest Service and the County maintain that Lewis Creek Road, where it traverses the Bonanza Extension mining claim, is a public road under Revised Statute 2477 ("R.S.2477"), by which Congress granted the right-of-way for construction of public roads over public lands. Second, the Forest Service and the County contend that Lewis Creek Road, where it traverses the Bonanza Extension, Eagle Pass, and Eureka mining claims, is a public road by adverse possession pursuant to C.R.S. § 43–2–201(1)(c). Lastly, the County, but not the Forest Service, contends that Lewis Creek Road is public by operation of C.R.S. § 43–1–202, which declares as "public highways" all roads and highways open to public traffic on May 4, 1921. I address each statute separately.

### a. Public Use Under Revised Statute 2477

■ Revised Statute 2477 provided that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." The Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253 (1866) (formerly codified at 43 U.S.C. § 932), *repealed by* Federal Land Policy Management Act ("FLPMA"), Pub.L. No. 94–579, § 706(a), 90 Stat. 2743, 2793 (1976). Though Congress repealed R.S. 2477, the FLPMA preserved any rights-of-way that existed before October 21, 1976. 43 U.S.C. § 1769(a). Whether and when the offer of grant is accepted by the public are questions resolved by state law. *Sierra Club v. Hodel,* 675 F.Supp. 594, 604 (D.Utah 1987), *rev'd in part on other grounds,* 848 F.2d 1068 (10th Cir. 1988); *Wilkenson v. Dep't of Interior,* 634 F.Supp. 1265, 1272 (D.Colo.1986); *United States v. Jenks,* 804 F.Supp. 232, 235 (D.N.M.1992), *rev'd in part on other grounds,* 22 F.3d 1513 (10th Cir.1994).

■ Colorado courts have interpreted R.S. 2477 as "an express dedication for a right of way for a road over the land belonging to the government not reserved for a public use." *Sprague v. Stead,* 56 Colo. 538, 543, 139 P. 544, 545 (1914). In *Leach v. Manhart,* 102 Colo. 129, 77 P.2d 652 (1938), the Colorado Supreme Court described how the public could have accepted the Congressional grant:

> We have had occasion to consider [R.S. 2477] ... in varying situations. The sum of our holdings is that the statute is an express dedication of a right of way for roads over unappropriated government lands, acceptance of which by the public results from use by those for whom it was necessary or convenient. It is not required that work shall be done on such a road, or that public authorities shall take action in the premises. User is the requisite element, and it may be by any who have occasion to travel over public lands, and if the use be by only one, still it suffices. A road may be a highway though it reaches but one property owner. He has a right to access to other roads and the public has a right of access to him. Its character is not determined by the fact that but few persons use it.

*Id.* at 133, 77 P.2d at 653 (internal quotations and citations omitted) (quoted with approval in *Brown v. Jolley,* 153 Colo. 530, 537, 387 P.2d 278, 281–282 (1963)). Of course, such use must occur before the land in question is withdrawn from the public domain or included within a reserve. *See, e.g., Jenks,* 804 F.Supp. at 235–236 (roads created after Presidential proclamation reserved land as national forest were not public roads under R.S. 2477); *Nicolas v. Grassle,* 83 Colo. 536, 537, 267 P. 196, 197 (1928) (public right-of-of way under R.S. 2477 perfected before homestead entrymen took title); *Greiner v. Board of Comm'rs of Park County,* 64 Colo. 584, 587, 173 P. 719, 720 (1918) (public right-of-way perfected under R.S. 2477 before land reserved for school purposes); *Korf v. Itten,* 64 Colo. 3, 7–8, 169 P. 148, 150 (1917) (board of county commissioners' order declaring certain section lines as public highways did not affect the lands for which homestead entry filings existed). *See also Sprague,* 56 Colo. at 543, 139 P. at 546 ("subsequent entrymen and claimants"

take land subject to rights-of-way created under R.S. 2477). "Public land, or land on the public domain, is land which is open to sale or other disposition under general laws." *Board of County Comm'rs of Cheyenne County v. Ritchey*, 888 P.2d 298, 299 (Colo.App.1994); *accord Ute Indian Tribe v. State of Utah*, 716 F.2d 1298, 1305 (10th Cir.1983) (creation of an Indian reservation or a forest or other particular use from public land removes it from the public domain). Thus, any land to which any claims or rights of others have attached does not fall within the designation of land on the public domain. *Bardon v. Northern Pac. R. Co.*, 145 U.S. 535, 539, 12 S.Ct. 856, 36 L.Ed. 806 (1892).

Applying these established legal principles to this case, the Forest Service and the County must establish public use, as described in *Leach*, of Lewis Creek Road where it crosses the Bonanza Extension mining claim, before such mining claim was removed from the public domain. The date of a patent's issuance, however, is not necessarily the date the land is withdrawn from the public domain; indeed, it may be an earlier date. *See, e.g., Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*, 145 U.S. 428, 431–432, 12 S.Ct. 877, 36 L.Ed. 762 (1892) (discussing the differences between patented and unpatented mining claims) (holding that a patent, when issued, relates back to the date of the inception of the rights of the patentee in the land); *Witherspoon v. Duncan*, 71 U.S. (4 Wall.) 210, 216, 18 L.Ed. 339 (1866) (once entry is made and certificate is delivered, land ceases to be a part of the public domain); *Ritchey*, 888 P.2d at 300 (date of filing of plat, rather than date of patent's issuance by the President, constitutes effective date of land's withdrawal from public domain).

█ As noted above, the approximate entry date for the Bonanza Extension mining claim is 1926. The road, where it traverses the Bonanza Extension mining claim, follows substantially the same path as Eagle Pass Trail. Eagle Pass Trail provided access to the mining claims on the eastern side of Eagle Pass beginning as early as 1883, when the Ashland–Ten Broeck Mine commenced operations. Thus, public use of Eagle Pass Trail, where it traverses or traversed the Bonanza Extension mining claim, occurred well before the Bonanza Extension mining claim was withdrawn from the public domain in 1926. And as concluded by Mr. Bell, those who mined the mining claims on the eastern side of Eagle Pass likely traveled over and down the western side of Eagle Pass to La Plata City, Mayday, Parrott City, or Hesperus. I conclude, therefore, that the Forest Service and the County have shown, by a preponderance of the evidence, that Lewis Creek Road, where it traverses the Bonanza Extension mining claim, is a public road by operation of R.S. 2477.

**b. Adverse Use Under C.R.S. § 43–2–201(1)(c)**

█ The Forest Service and the County also rely on C.R.S. § 43–2–201(1)(c) (1997), which declares that public highways include "[a]ll roads over private lands that have been used adversely without interruption or objection on the part of the owners of such land for twenty consecutive years." A party claiming a public highway by adverse use under § 201(1)(c) must prove that: (1) the public has used the road under a claim of right and in a manner adverse to the landowner's property interest; (2) the public has used the road without interruption for the statutory period of 20 years; and (3) the landowner had actual or implied knowledge of the public use of the road and made no objection. *Walter v. Hall*, 940 P.2d 991, 995 (Colo.App.1996) (citing *Board of County Comm'rs of the County of Saguache v. Flickinger*, 687 P.2d 975 (Colo.1984)); *see also Ritchey*, 888 P.2d at 300 (to acquire land by adverse possession, one must prove possession of the disputed parcel for the statutory period and that this possession was hostile, adverse, actual, under a claim of right, exclusive, and uninterrupted). A showing of force or actual dispute is not necessary to constitute hostile entry

or to lay a foundation for a claim of adverse possession. All that is required to establish hostility is that the person claiming adverse possession occupy the property adversely to the rights of the record holder. *Anderson v. Cold Spring Tungsten, Inc.,* 170 Colo. 7, 10, 458 P.2d 756, 758 (1969). One claiming title by adverse possession has the burden of proving the claim by a preponderance of the evidence. *Gerner v. Sullivan,* 768 P.2d 701 (Colo. 1989).

■ The County and the Forest Service allege that Lewis Creek Road, where it traverses the Bonanza Extension, Eagle Pass, and Eureka mining claims, is public by virtue of adverse use. Because I concluded above that the road is public where it traverses the Bonanza Extension mining claim by virtue of R.S. 2477, I limit my analysis of adverse use to the Eagle Pass and Eureka mining claims.

Based on the evidence, both testimonial and documentary, I conclude the County and Forest Service have not established by a preponderance of the evidence that Lewis Creek Road, where it traverses the Eagle Pass and Eureka mining claims, has been used adversely without interruption or objection on the part of the owners of such land for twenty consecutive years. As noted above, Lewis Creek Road, where it traverses the Eagle Pass and Eureka mining claims, did not exist until 1954 and does not follow substantially the same path as Eagle Pass Trail. Accordingly, the County and Forest Service were bound, but failed, to show a twenty-year period of adverse use from 1954 to the present. As found above, the Barkers and/or their predecessors in interest have erected locked cables and gates intermittently from 1954 to the present. Specifically, they erected locked cables and gates in 1957 and 1974 and, therefore, the County and Forest Service fail to show continuous, uninterrupted use for a period of twenty years as required by § 201(1)(c). *See Martino v. Fleenor,* 148 Colo. 136, 141, 365 P.2d 247, 250 (1961) ("[I]f a landowner obstructs free travel by means of gates or fences it ordi-

narily prevents the public from acquiring a highway be prescription."); *Flickinger,* 687 P.2d at 981 (placement of a gate to obstruct free travel along a road will ordinarily render public use of the road permissive); *Walter v. Hall,* 940 P.2d 991, 995 (Colo.App.1996) (locked gates on road evidence owner's objection to public use of road).

Even if the Barkers and/or their predecessors in interest had not erected such cables and gates, any use by the public from 1954 and the present constitutes permissive use, for the land at issue, between 1954 and the present, has been vacant, unoccupied, unenclosed, and unimproved. *See Simon by Simon v. Pettit ("Simon I"),* 651 P.2d 418, 421 (Colo.App.1982) (where the land is vacant, unenclosed, and unoccupied, a rebuttable presumption of permissive use exists); *see also Durbin v. Bonanza Corp.,* 716 P.2d 1124, 1129 (Colo.App. 1986). Although several of the mining claims along Lewis Creek Road have habitable improvements such as cabins, the same cannot be said for the Eagle Pass and Eureka mining claims, at least since 1954. While the presumption of permissive use is rebuttable, *Durbin* at 1129, the County and Forest Service presented insufficient evidence to rebut the presumption as to the Eagle Pass and Eureka mining claims.

### c. Open to Public Traffic Under C.R.S. § 43–1–202

■ Lastly, the County, but not the Forest Service, contends that Lewis Creek Road, where it traverses the Eagle Pass and Eureka mining claims, is public by operation of C.R.S. § 43–1–202, which states: "All roads and highways which are, on May 4, 1921, by law open to public traffic shall be public highways ..." I disagree. As discussed, that portion of Lewis Creek Road did not exist until 1954 and does not follow substantially the same path or line as Eagle Pass Trail. Thus, that portion of the road could not have been "open to public traffic" on May 4,

1921. Even if footpaths existed on the Eagle Pass and Eureka mining claims on May 4, 1921, and the evidence does not establish this, such footpaths do not constitute "roads" or "highways" within the meaning of § 202 considering their presumed characteristics, conditions, and location. *See Simon v. Pettit ("Simon II"),* 687 P.2d 1299, 1302–1303 (Colo.1984) (construing the definition of "road" within the meaning of § 201(1)(c)) (citing, *inter alia, Watson v. Board of County Road Comm'rs for Montmorency County,* 52 Mich.App. 258, 217 N.W.2d 129 (1974) (logging trail consisting of two ruts and a mound of turf was in no condition to be maintained and was not a public highway)). I conclude, therefore, that Lewis Creek Road, where it traverses the Eagle Pass and Eureka mining claims, is not public by virtue of § 202.

### d. Summary

In conclusion, Lewis Creek Road is public where it crosses the Bonanza Extension mining claim by virtue of R.S. 2477. However, Lewis Creek Road is privately owned by Mrs. Barker where it crosses the Eagle Pass and Eureka mining claims. The Forest Service and County failed to prove, by a preponderance of the evidence, that Lewis Creek Road, where it traverses the Eagle Pass and Eureka mining claims, is public by operation of § 201(1)(c) or § 202. Consequently, Ruth Barker may erect a gate where Lewis Creek Road crosses the northern and southern boundaries of the Eagle Pass and Eureka mining claims.

## IV. THE PERINIS' OBJECTION TO THE SETTLEMENT STIPULATION

As noted above, the Sefton Trust, the Forest Service, the County, the heirs of McCloskey, and the Briggs entered into a "Settlement Stipulation" on December 3, 1998, which was filed with the Court on December 4, 1998. That stipulation states, in relevant part:

1. The public shall be allowed to use Lewis Creek Road by motorized vehicle, foot, horseback, mountain bicycle, cross country ski, and/or snowshoe from its junction with La Plata Canyon Road, [also known as] La Plata County Road 124, to a point on Lewis Creek road on the piece of National Forest land between the Bonanza Lode Claim and the Brawner Lode (hereinafter the "Turnaround Point"). The Turnaround Point is depicted on Defendants Forest Service's and La Plata County's joint defense trial Exhibit C, which is attached hereto as Exhibit A. The public shall be allowed to park at a Parking Lot which will accommodate 5 full sized pickup trucks. The Parking Lot will be located on National Forest Land between the private property owned by the Sefton Trust and the private property owned by the heirs of Reese McCloskey, as depicted on Defendants Forest Service's and La Plata County's joint defense trial Exhibit C, which is attached hereto as Exhibit A. The public shall not be allowed to park east of the Parking Lot. The Parking Lot shall be marked with appropriate signage, which shall indicate that no parking by the public is authorized east of the Parking Lot.

2. The heirs of Reece McCloskey, the Sefton Trust, and the Briggs Defendants shall be allowed to continue to use the entire length of Lewis Creek Road for all lawful purposes by motorized vehicle, foot, horseback, cross country ski, and/or snowshoe. The parties to this Settlement Stipulation understand that Defendant Forest Service will allow the bona fide members of the Durango Radio Club to continue to use the entire length of Lewis Creek Road by motorized vehicle for access to the Durango Radio Club radio transmission facility for Durango Radio Club business conducted at the radio transmission facility; and the other parties to this Settlement Stipulation will likewise allow the bona fide members of the Durango Radio Club to continue to use the entire length of Lewis Creek Road by motorized vehicle for access to the Durango Radio Club radio transmission facility for Du-

rango Radio Club business conducted at the radio transmission facility.

3. Plaintiff Ruth Barker's and Defendant Perinis' use of those portions of Lewis Creek Road which cross National Forest land shall be subject to all conditions and restrictions which Defendant Forest Service may impose. Plaintiff Ruth Barker and Defendant Perinis— but not the heirs of Reece McCloskey, the Sefton Trust, nor the Briggs Defendants—shall be required to obtain a special use permit from Defendant Forest Service in order to use those portions of Lewis Creek Road which cross National Forest land, and Plaintiff Ruth Barker and Defendant Perinis shall be required to abide by all of the terms and conditions in such special use permit as Defendant Forest Service may issue. Defendant Forest Service shall be under no obligation to issue a special use permit to Plaintiff Ruth Barker or to Defendant Perinis for use of the portions of Lewis Creek Road which cross National Forest land, except as may be required under federal statute and regulations issued by Defendant Forest Service. The parties to this Settlement Stipulation understand that Defendant Forest Service will not require bona fide members of the Durango Amateur Radio Club to obtain a special use permit in order to use Lewis Creek Road to access the Durango Amateur Radio Club radio transmission facility, to conduct Durango Amateur Radio Club business at the radio transmission facility.

4. Beyond the Turnaround Point, the public shall not be allowed to use Lewis Creek Road by motorized vehicle. Beyond the Turnaround Point, the public's use of Lewis Creek Road shall be limited to foot, horseback, mountain bicycle, cross country ski, and snowshoe.

5. Employees of La Plata County, the State of Colorado, and/or of the United States shall be allowed to use the entire length of Lewis Creek Road by government motorized vehicle for official government use.

6. The heirs of Reece McCloskey, the Sefton Trust, and the Briggs Defendants shall be allowed to construct and maintain at their expense suitable physical barriers, including fences and lockable gates or cables, at the Turnaround Point or at any place east of the Turnaround Point. Defendant Forest Service or Defendant La Plata County shall also be allowed to construct and maintain at their expense suitable physical barriers, including fences and lockable gates or cables, at the Turnaround Point or at any place east of the Turnaround Point. The barriers shall prevent use of Lewis Creek Road by unauthorized motorized vehicles, but shall allow passage by persons traveling by horse, mountain bicycle, foot, cross country ski, and/or snowshoe.

7. Local, state, and federal governmental agencies shall be given keys to the locks on the lockable gates or cables, to allow the governmental agencies to make use of Lewis Creek Road as authorized in this Settlement Stipulation. The bona fide members of the Durango Amateur Radio Club shall be given keys to the locks on the lockable gates or cables, to allow them to make use of Lewis Creek Road as authorized in this Settlement Stipulation.

8. The owners of patented mining claims along Lewis Creek Road shall be given keys to the locks on the lockable gates or cables.

\*        \*        \*        \*        \*        \*

13. The parties to this Settlement Stipulation shall jointly move the Court for a final judgment and decree implementing this Settlement Stipulation, and such judgment and decree shall be recorded in the real estate records of the La Plata County Clerk and Recorder. Such final judgment and decree shall incorporate that certain Unopposed Stipulation entered into by the private parties on March 23, 1998, in which the heirs of Reece McCloskey, the Sefton Trust, the Briggs Defendants, as well as

Plaintiff Ruth Baker and Defendants Perinis, agreed to grant to each other a easement and acknowledged that Defendants Perini, and/or their predecessors in title, had acquired a nonexclusive easement to use that portion of Lewis Creek Road that crosses private land. Further, the final judgment and decree shall also incorporate the Order entered by the Court on November 12, 1998, which, *inter alia,* granted Defendants Perini's motion for partial summary judgment regarding their acquisition of a non-exclusive prescriptive easement to use Lewis Creek road. The legal descriptions of the patented mining claims along Lewis Creek Road appear at Exhibit B. The map showing the location of Lewis Creek Road appears at Exhibit C. The current owners of the affected patented mining claims appear on Exhibit D.

(Settlement Stipulation, Filed 12/4/98 (underlining in original).)

On December 21, 1998, the Perinis filed an "Objection to Portions of the Settlement Stipulation." Specifically, the Perinis object to paragraph 3 of the stipulation, which purports to obligate the Forest Service to require the Perinis and Mrs. Barker to obtain "a special use permit." The Perinis argue that the stipulating parties unlawfully attempt to bind parties not joining the stipulation. The Perinis also contend that the stipulation impermissibly attempts to reverse the holding of my Memorandum Opinion and Order entered November 12, 1998 ("the November 1998 order"), which granted the Perinis' motion for partial summary judgment regarding their acquisition of a nonexclusive prescriptive easement to use Lewis Creek Road as stipulated by the parties in the pretrial order.

In their motion for partial summary judgment, the Perinis requested the issuance of an order declaring that they own a nonexclusive prescriptive easement for access to their mining claims situated on the eastern side of Eagle Pass, which easement includes:

... that portion of the Lewis Creek Road that runs through the properties owned by Plaintiff Ruth Barker and other Defendants, including the Defendant United States. Further, the Perinis move the court to declare that the Perinis non-exclusive easement is for all lawful purposes, including, without limitation, the easement and right-of-way, and the right to vary the use to a reasonable extent, for all lawful purposes, including, without limitation, for the exploration, development, mining, haulage of timber, equipment, supplies, ores, and any and all purposes incidental thereto.

(Perinis' Summ.J.Mot. of 9/3/98 at 10–11.) The County, Mrs. Barker, the Sefton Trust, the Briggs, and the heirs of McCloskey did not object to the Perinis' motion for partial summary judgment. The Forest Service filed a response to the Perinis' motion for partial summary judgment, contending that: (1) if the entire length of Lewis Creek Road is declared to be a public road, then the Forest Service lacks the legal authority to regulate use of the road by the Perinis or anyone else; and (2) if the plaintiffs prevail and Lewis Creek Road is declared private as to those sections of the road that cross patented mining claims, then the Forest Service reserves the right to reasonably regulate those portions of the road that cross public land.

The pretrial order, entered on October 29, 1998 and after the Forest Service responded to the Perinis' motion, contains the following stipulations of fact and law:

The Perinis and/or their predecessors in title have used Lewis Creek Road from the junction with County Road 124 over Eagle Pass for access to the Perini Claims, or some of them, beginning with the operation of the Ashland–Ten Broeck Mine in 1883, the New Hope Mine and the Durango Girl Mine in 1893. The Perinis and/or their predecessors have used Lewis Creek Road, including that portion over public lands administered by the United States For-

est Service, and including that portion of the Lewis Creek Road that runs through the Plaintiff Ruth Barker's Subject Property. The Perinis have used the road for the exploration, development, and mining, haulage of timber, equipment, supplies, ores, and purposes incidental thereto.

The Perini Brothers and/or their predecessors in title, acquired said non-exclusive prescriptive easement to use the Lewis Creek Road which starts at County Road 124, also known as La Plata Canyon Road, from the junction with County Road 124, over Eagle Pass, including that portion of Lewis Creek Road that runs through the Barker/Subject Property to access the Perini Claims or any of them for all lawful purposes to access their respective mining claims, including, without limitation, the easement and right of way, and the right to vary their use to a reasonable extent, for the exploration, development, and mining, haulage of timber, equipment, supplies, ores, and any and all purposes incidental thereto. The Perinis and/or their predecessors in interest have acquired such prescriptive easements through their use that was continuous, open, notorious, hostile and adverse to the interest of all Defendants and Ruth Barker and her or their predecessors in interest, for a period in excess of twenty (20) years, during which time the Perinis and their predecessors in interests have used the Lewis Creek Road on a regular basis.

(Pretrial Ord. of 10/29/98 at 8.) The pretrial order is signed by each party's counsel, including counsel for the Forest Service.

In the November 1998 order, I concluded that, as a matter of law, the stipulations found in the pretrial order conceded the relief requested by the Perinis. Because the Forest Service recognized that the Perinis acquired at least a non-exclusive right to use the entirety of Lewis Creek Road, I granted the Perinis' motion for partial summary judgment, noting the Forest Service's reservation of its rights to regulate the use of Lewis Creek Road to the extent permitted by law. I cautioned that "[s]uch regulation, however, is not a question before me."

In response to the Perinis' objection, the Forest Service states that it "did not intend, in entering into the December 3, 1998, Settlement Stipulation, to bypass the Court's November 12, 1998, Memorandum Opinion and Order." (Forest Service Resp. of 1/8/99 at 1.) The Forest Service further states that the Settlement Stipulation does not create a case or controversy because it has not made a specific demand on the Perinis to obtain a special use permit or otherwise restricted the Perinis' access to their patented mining claims. (Forest Service Resp. of 1/8/99 at 1.) I agree with the Forest Service that, at this juncture, no case or controversy currently exists. Based on the record before me now, the Forest Service has not restricted the Perinis' access to their mining claims. I will not issue an advisory opinion regarding whether the Forest Service has the discretion to issue or not issue a special use permit to the Perinis. It is sufficient to note that the Perinis have at least a nonexclusive easement to use the entirety of Lewis Creek Road, subject to the Forest Service's right to reasonably regulate certain portions of the road that traverse public land. Lastly, I do not construe the Settlement Stipulation of December 3, 1998 as imposing contractual obligations on the Perinis.

Accordingly, it is ORDERED, ADJUDGED, and DECREED that:

(1) by virtue of R.S. 2477, Lewis Creek Road is public where it crosses the Bonanza Extension mining claim;

(2) Lewis Creek Road, where it crosses the Eagle Pass and Eureka mining claims, is privately owned by Ruth Barker;

(3) the Forest Service and the County are PERMANENTLY ENJOINED from interfering with Ruth Barker's construction and maintenance of a gate where Lewis Creek Road cross-

es the northern and southern boundaries of the Eagle Pass and Eureka mining claims.

(4) the Perinis and/or their predecessors in title acquired a non-exclusive prescriptive easement to use Lewis Creek Road from its junction with La Plata Canyon Road, also known as La Plata County Road 124, over Eagle Pass, including that portion of Lewis Creek Road that runs through the Eagle Pass and Eureka mining claims, for all lawful purposes to access their respective mining claims, including, without limitation, the easement and right of way, and the right to vary their use to a reasonable extent, for the exploration, development, and mining, haulage of timber, equipment, supplies, ores, and any and all purposes incidental thereto; the Forest Service's reservation of its rights to regulate the use of the road by the Perinis to the extent permitted by law is noted; and

(5) on or before May 27, 1999, the Sefton Trust shall SHOW CAUSE why its claims and counterclaims should not be dismissed.